[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14306

_____

D.C. Docket No. 1:14-cv-01196-WHA-WC

J.S., III,
a minor, by and through J.S. Jr. and M.S., his parents
and next friends,

Plaintiff - Appellant,

versus

THE HOUSTON COUNTY BOARD OF EDUCATION,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(October 2, 2017)

Before WILLIAM PRYOR, JORDAN, and RIPPLE,[*] Circuit Judges.

PER CURIAM:

J.S., III is an elementary school student with severe physical disabilities and cognitive impairments. Through his parents, J.S., Jr. and M.S., he appeals the district court's grant of summary judgment in favor of the Houston County Board of Education on his claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. J.S. alleges that he was discriminated against on the basis of his disability while attending Wicksburg High School, a kindergarten through twelfth-grade school in Houston County, Alabama. Following oral argument and a review of the record, we affirm in part and reverse in part the district court's order, and remand for further proceedings.

## I

When J.S. was in the third grade (2010 to 2011) and fourth grade (2011 to 2012), he received individual education plans (IEPs), under which he was assigned to regular and special education classrooms. The IEPs noted that J.S. had poor balance, used a walker and a wheelchair at school, needed help with using the restroom, and received physical and occupational services while at school. The IEPs specified that J.S. was to spend 80 percent of his time in the regular

---

[*] The Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

2

classroom and 20 percent of his time in the special education classroom. Alicia Brown was J.S.' special education teacher during his third-grade year and part of his fourth-grade year and Angie Boatright was his regular classroom teacher during his fourth-grade year. Drew Faircloth was assigned to work with J.S. as a teacher's aide/special education paraprofessional starting J.S.' third-grade year. Mr. Faircloth helped J.S. with going to the restroom, getting around the school campus, going to lunch and recess, participating in physical education, and completing class work.

In late 2011 and early 2012, Mr. Faircloth began taking J.S. out of his regular classroom and bringing him to the school's weight room, purportedly because J.S. was disruptive in the classroom and because they could do physical therapy and use the private restroom there. Ms. Boatright testified that she never instructed Mr. Faircloth to take J.S. out of the classroom for being a distraction to others or being distracted himself. *See* Boatright Dep., D.E. 28-20 at 24–25, 58.

Matt Barton and Brandon Sunday, both elementary physical education teachers and coaches at Wicksburg, observed Mr. Faircloth and J.S. in the weight room. Coach Barton testified that Mr. Faircloth brought J.S. into the weight room "fairly often" and that on some days J.S. completed class work and worksheets in the weight room, while on other days he would be just "kind of . . . hanging out" while Mr. Faircloth was sitting in the coach's office using the computer. *See*

3

Barton Dep., D.E. 28-22 at 23–27. Coach Sunday said that he saw J.S. and Mr. Faircloth in the weight room at least once a week generally, sometimes twice a week. He testified that J.S. would often be doing class work at a small desk, while Mr. Faircloth was on the other side of the window inside the coach's office talking with Coach Barton, occasionally helping J.S. if he had a question. *See* Sunday Dep., D.E. 28-23 at 32–33.

Ms. Brown testified that she heard from other teachers that Mr. Faircloth was taking J.S. to the weight room and informed Wicksburg Principal Cheryl Smith at least twice. *See* Brown Dep., D.E. 28-26 at 25, 30–31, 38. Principal Smith testified that she spoke with Mr. Faircloth and asked him to stop taking J.S. to the weight room. *See* Smith Dep., D.E. 28-27 at 72. Mr. Faircloth continued to remove J.S. from the classroom.

In March of 2012, a fellow student, R.T., witnessed Mr. Faircloth kick J.S.' wheelchair, while telling him to be quiet, refusing to pick up his pencil for him, and otherwise berating him. R.T. told her parents, who then informed J.S.' parents about what R.T. had witnessed. In response, J.S.' parents placed an audio recorder underneath J.S.' wheelchair for several days. According to J.S.' parents, the device captured verbal abuse by Mr. Faircloth and Ms. Brown, and possible physical abuse by Mr. Faircloth.

4

J.S.' parents contacted the school district's special education coordinator, Denise Whitfield, to report what they had heard on the recordings. Mr. Faircloth and Ms. Brown were placed on administrative leave and received written reprimands from Principal Smith. Mr. Faircloth ultimately resigned from his position and the School Board decided not to renew Ms. Brown's contract.

J.S., through his parents, originally filed an action in 2012 against the School Board, Mr. Faircloth, Ms. Brown, and others. He settled his claims against Mr. Faircloth and Ms. Brown. The district court granted summary judgment to the School Board because J.S. had failed to exhaust his administrative remedies, but dismissed the suit without prejudice. J.S. subsequently filed an administrative due process complaint with the Alabama Department of Education pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, and J.S. and the School Board resolved that dispute. J.S. then filed this action against the School Board, alleging Title II and § 504 violations relating to his removal from the classroom and the verbal and physical abuse.

The district court granted summary judgment in favor of the School Board, concluding that (1) regarding his removal from the classroom, J.S. had not shown more than a failure to provide a free appropriate public education (FAPE) under

5

the IDEA; and (2) J.S. had not provided any evidence that the School Board had notice of future verbal and physical abuse. This appeal followed.[1]

## II

We review the grant of summary judgment *de novo*, applying the same legal standard used by the district court and drawing all factual inferences in the light most favorable to the nonmoving party. *See Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1242–43 (11th Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In order to overcome a motion for summary judgment, the moving party must present more than a mere scintilla of evidence supporting his position, and must make a sufficient showing that a jury could reasonably find in his favor. *See Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

---

[1] The district court denied J.S.' motion to alter or amend the judgment based on a Department of Justice Letter of Finding and a decision by this Court that were both issued after the motion for summary judgment was briefed. J.S. does not appear to challenge that ruling.

6

## III

Title II of the ADA and § 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 states that "[n]o otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). To state a claim under Title II and § 504, a plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion,

7

denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).[2]

J.S. argues that the district court erred by mischaracterizing his Title II and § 504 claim regarding his removal from his regular classroom as merely a claim that he was denied a FAPE, a right guaranteed under the IDEA. The IDEA "guarantees individually tailored educational services," whereas Title II and § 504 "promise non-discriminatory access to public institutions"—specifically aiming "to root out disability-based discrimination, enabling each covered person . . . to participate equally to all others in public facilities and federally funded programs." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017). Courts have recognized that there is often "some overlap in coverage" across these statutes and that "[t]he same conduct might violate all three statutes." *Id.*

The district court reasoned that, in order to demonstrate discrimination in the education context, a plaintiff must show more than a simple failure to provide a FAPE; he must also demonstrate bad faith or gross misjudgment by the school, or show that he suffered discrimination solely because of his disability. The district court concluded that J.S. had not presented evidence that the departure from his IEP amounted to gross misjudgment, and had not demonstrated that he was treated differently or excluded from something that other students received. We agree that

---

[2] It is undisputed that J.S. is a qualified individual with a disability.

"[t]o prove discrimination in the education context, something more than a mere failure to provide the 'free appropriate education' required by [IDEA] must be shown," *Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998) (internal quotation marks and citation omitted), but disagree with the district court's conclusion that J.S. merely set out an IDEA claim.

In the context of determining whether a claim under Title II or § 504 seeks relief that is also available under the IDEA and is therefore also subject to the IDEA's exhaustion requirement, the Supreme Court has stated that "[w]hat matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Fry*, 137 S. Ct. at 755. Although we are not examining the issue of exhaustion under the IDEA, we find this guidance instructive.

To determine whether a claim seeks relief available under the IDEA, the Supreme Court has proposed that courts ask a pair of hypothetical questions: first, whether the claim could have been brought if the alleged conduct occurred at a public facility outside of a school (such as a public theater or library); and second, whether it could have been brought by an adult at the school. If the answer to these questions is no, then the complaint likely concerns a FAPE violation under the IDEA. *See id.* For example, an allegation that a school building lacks access to ramps would likely state a claim under Title II, whereas an allegation that a student

9

with a learning disability was not provided remedial tutoring in mathematics would likely assert a claim only for the denial of a FAPE. *See id.* at 756–57. Another factor to consider is the history of the proceedings and whether a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute. *See id.* at 757.[3]

The cause of action here does not fit neatly into *Fry*'s hypotheticals. The complaint here specifically alleges that the School Board "allowed J.S. [ ] to be removed from his regular classroom, based on discriminatory reasons and for no purpose related to his education." Compl., D.E. 1 at 46. Unlike the examples in *Fry*, here we cannot as easily divorce J.S.' claim of isolation from the context of him being an elementary student at a school. Although this claim could be brought as a FAPE violation for failure to follow J.S.' IEP, we conclude that it is also cognizable as a separate claim for intentional discrimination under the ADA and § 504.

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court concluded that unjustified institutional isolation of persons with disabilities is a form of discrimination based on disability under Title II. *See id.* at 599–600. The Court considered two important factors in coming to this conclusion: one, that

---

[3] Justice Alito's concurrence in *Fry* took issue with the majority's hypotheticals, noting that these "misleading clues" "make sense only if there is no overlap between the relief available under" the IDEA and Title II and § 504. *Id.* at 759 (Alito, J., concurring) (internal quotation marks omitted and alteration adopted). As we explain, this may be one of those circumstances in which *Fry*'s hypotheticals could "lead [us] astray." *Id.*

"institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and, two, that "confinement in an institution severely diminishes the everyday life activities of individuals." *Id.* at 600–01.

Isolation via institutionalization is admittedly a more extreme and restrictive action than removal from a school classroom, but the reasoning in *Olmstead* seems to apply here. J.S. has alleged—and has provided evidence tending to show—that he was, with some frequency, excluded and isolated from his classroom and peers on the basis of his disability. Although the circumstances alleged here do involve a violation of J.S.' IEP, they also implicate those further, intangible consequences of discrimination contemplated in *Olmstead* that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework. *Compare K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (recognizing that "unnecessary social isolation has been considered a form of actionable discrimination" and concluding that, in light of *Olmstead*, a disabled student's isolation during lunch appears to be such a claim), *with Sellers*, 141 F.3d at 529 (concluding that allegations that a school board failed to recognize a student's

11

disability based on test scores were insufficient to state a claim under § 504). Accordingly, the district court erred in analyzing this claim as merely a FAPE violation under the IDEA.

## IV

Having concluded that J.S. has stated a claim of intentional discrimination, we must next determine whether the School Board can be held liable for such discrimination under Title II and § 504. We have held that it is appropriate to look to Title IX case law for guidance in examining discriminatory intent under § 504. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347 (11th Cir. 2012). Under Title IX (and, by extension, Title II and § 504), a plaintiff may establish intentional discrimination by showing deliberate indifference. *See id.* at 347–48. "Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their response . . . or lack thereof is clearly unreasonable in light of the known circumstances." *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010) (internal quotation marks and citation omitted). We may, on a motion for summary judgment, determine that a response was not "clearly unreasonable" as a matter of law. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649 (1999).

Title IX is "predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524

12

U.S. 274, 290 (1998). So, "[f]or an organization to be liable for Title IX purposes, [a plaintiff must show] the deliberate indifference of 'an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the organization's behalf and who has *actual knowledge* of discrimination in the organization's programs and fails adequately to respond.'" *Liese*, 701 F.3d at 349 (alterations adopted) (quoting *Gebser*, 524 U.S. at 290).

"[T]he ultimate question of who is an appropriate person is necessarily a fact-based inquiry because officials' roles vary among school districts." *Broward Cty.*, 604 F.3d at 1256 (internal quotation marks and citation omitted). "An 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290. "[T]he official with notice . . . must be 'high enough up the chain-of-command that his [or her] acts constitute an official decision by the school district itself not to remedy the misconduct.'" *Broward Cty.*, 604 F.3d at 1255 (quoting *Floyd v. Waiters,* 171 F.3d 1264, 1264 (11th Cir. 1998)).

J.S. argues that Principal Smith, Ms. Brown (his special education teacher), Ms. Boatright (his regular education teacher), and Coach Barton and Coach Sunday (both physical education teachers), were all appropriate persons who had the authority to take measures to correct Mr. Faircloth's conduct, and that

13

they were each deliberately indifferent to actual notice that Mr. Faircloth was removing J.S. from his regular classroom. We address each individual in turn.

## A

J.S. first argues that Principal Smith was an appropriate person who failed to adequately respond to actual notice that Mr. Faircloth was bringing him into the weight room regularly. In *Broward County*, we held that a principal was an "appropriate person" to receive Title IX actual notice because that principal, as "the highest-ranking school official on site" at the school, was "equipped with many . . . means of deterring or stopping sexual harassment of students, such as admonishing the teacher, conducting a thorough preliminary investigation, swiftly reporting the abuse, and monitoring the teacher's behavior." 604 F.3d at 1255, 1257. Indeed, we noted that the Supreme Court's decisions in *Gebser* and *Davis* "appeared to presume that the principal could be an appropriate person" and that "the majority of our sister circuits addressing the issue have interpreted [those] opinions as standing for the proposition that at least in some circumstances, if not generally, a principal enjoys ample authority to 'take corrective measures' in response to allegations of teacher or student . . . harassment." *Id.* at 1256.

Principal Smith specifically testified that she was Mr. Faircloth's immediate supervisor. *See* Smith Dep. at 109. A Houston County high school principal has "direct and primary responsibility for his/her school and [he/she] serves as the

14

administrative and supervisory head of the school." *See* High School Principal Job Description, D.E. 28-25 at 5. The principal is tasked with "[s]upervis[ing] assigned personnel, conduct[ing] annual performance appraisals, and mak[ing] recommendations for appropriate employment actions," as well as "[i]mplement[ing] school board policy, state statutes, and federal regulations." *Id.* at 3. Given our precedent generally recognizing principals as appropriate persons, as well as Principal Smith's responsibilities in supervising staff and implementing regulations, the record establishes, at minimum, that a reasonable jury could determine that Principal Smith, as the "highest-ranking official" at Wicksburg, was an appropriate person with authority to address the alleged discrimination.

As for the failure to adequately respond to actual notice of discrimination, Principal Smith testified that she was informed by Ms. Brown only once, in approximately October of 2011, that Mr. Faircloth was taking J.S. to the weight room. She stated that she told Mr. Faircloth that she would "rather him not take [J.S.] back to that weight room" and that she was never subsequently informed that he had taken J.S. back to the weight room. *See* Smith Dep. at 72. But Principal Smith did not follow up to see if Mr. Faircloth followed her instructions. She acknowledged, moreover, that she did not inform J.S.' parents that he had been removed from the classroom, and did not ask J.S. directly what was happening while they were in the weight room because she believed Mr. Faircloth and his

15

explanation seemed reasonable. Ms. Brown, however, testified that when she later learned Mr. Faircloth was continuing to take J.S. into the weight room, she again told Principal Smith. The record does not show that Principal Smith took any action following the second notice, though she maintains that she was informed of Mr. Faircloth's behavior only that one time in October of 2011.

Viewing the evidence in the light most favorable to J.S., a jury could find that Principal Smith was deliberately indifferent in failing to follow up with Mr. Faircloth, or speak to J.S. or his parents after her discussion with Mr. Faircloth, and in failing to take adequate action when she was informed a second time that J.S. was being removed from the classroom. There is a genuine issue of material fact as to whether Principal Smith had actual knowledge and whether her response was clearly unreasonable, i.e., deliberately indifferent.

## B

J.S next argues that both Ms. Brown and Ms. Boatright had the authority to take corrective measures in response to his removal from the classroom, and that they responded to Mr. Faircloth's actions in a manner that was clearly unreasonable. We agree.

## 1

We have yet to determine whether a schoolteacher can serve as an appropriate person with authority to take corrective measures so as to constitute an

16

official decision from the school district itself. *See, e.g.*, *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1287–88 (11th Cir. 2003) (declining to address issue of notice and deliberate indifference based on teacher's actions and resting decision instead on denial of access issue). Based on the record before us, we conclude that a teacher can serve as an appropriate person and an issue of fact remains as to whether Ms. Brown and Ms. Boatright were appropriate persons.

In Houston County, both regular and special education teachers are responsible for "instruct[ing] and supervis[ing] the work of volunteers and aides when assigned." *See* Elementary Teacher Job Description, D.E. 28-30 at 6; Special Education Teacher Job Description, D.E. 28-11 at 2. Although Mr. Faircloth was assigned specifically to J.S., and not to a particular classroom, this fact, viewed in the light most favorable to J.S., supports the argument that the teachers held some supervisory authority over Mr. Faircloth as an aide. *See* Denise Whitfield 6-29-15 Dep., D.E. 28-29 at 31–32. Both teachers were also expected to "assist in [the] enforcement of school rules, administrative regulations[,] and [school board] policy." Elementary Teacher Job Description at 6; Special Education Teacher Job Description at 2.

The School Board's expert and special education director, Ms. Whitfield, testified that Ms. Brown was not "totally responsible" for Mr. Faircloth's supervision, but that she was responsible in part as J.S.' case manager, who had to

17

ensure the implementation of the IEP. *See* Whitfield Dep. at 32–33. *See also* Smith Dep. at 109–10, 115–16 (explaining that Ms. Brown did not have any immediate supervisory authority over Mr. Faircloth, but that she was responsible for the implementation, compliance, and enforcement of J.S.' IEPs, including informing school personnel, such as Mr. Faircloth, of their responsibilities under the IEP). Ms. Whitfield also said that Ms. Brown "could have told" Mr. Faircloth that J.S. was not supposed to be in the weight room and that she "had the authority to say whatever she wanted to say." *Id.* at 34–35. When asked whether Mr. Faircloth would have had to comply with Ms. Brown's instruction or admonition, Ms. Whitfield answered that "he should have complied if she told him that she didn't want him to take [J.S.] to the weight room [and that] if he didn't [comply] she could have gone to her supervisor." *Id.* at 36–37.

As for Ms. Boatright, Ms. Whitfield testified that Mr. Faircloth "should have" been required to follow an instruction by Ms. Boatright to not take J.S. to the weight room, if one had been given. *See id.* at 49. When asked whether Ms. Boatright had the authority by virtue of her position as J.S.' teacher to give such an instruction to Mr. Faircloth, Ms. Whitfield responded "[c]ertainly, I think she could have said that, yes." *Id.* at 49–50.

Viewing this evidence in the light most favorable to J.S., a reasonable jury could find that Ms. Boatright and Ms. Brown had authority to take corrective

18

action to stop Mr. Faircloth from removing J.S. from the classroom. In *Broward County*, we rejected the notion that "final employment decisions such as suspending, terminating, or reassigning an offending [individual] [are] the *only* corrective measures giving an official the power to remedy" harassment under Title IX. 604 F.3d at 1257. Instead, we recognized that there are "many other means of deterring or stopping [ ] harassment of students, such as admonishing the [individual], conducting a thorough preliminary investigation, swiftly reporting the abuse, and monitoring the [individual's] behavior." *Id.*

A reasonable jury could find that Ms. Brown and Ms. Boatright both held some sort of supervisory authority over Mr. Faircloth given their job descriptions and their designation as persons responsible for the implementation and enforcement of J.S.' IEP, and that they had the ability and authority to take such actions as those contemplated in *Broward County*. J.S., accompanied by Mr. Faircloth, was to spend approximately 80 percent of his time in Ms. Boatright's classroom, leaving her arguably the best-positioned school official to take action to remedy J.S.' removal from her classroom. And although Ms. Brown stated that she did not believe that it was her job to supervise Mr. Faircloth and that she could not have reprimanded or corrected him, the testimony of Ms. Whitfield and Ms. Smith suggests otherwise, particularly given

19

her role as J.S.' case manager and the individual responsible for informing school personnel of their responsibilities under the IEP.

**2**

The record also contains sufficient evidence from which a reasonable jury could find that both Ms. Brown and Ms. Boatright had knowledge of J.S.' removal from the classroom and that their respective responses were deliberately indifferent under the circumstances.

Although Mr. Faircloth did not usually accompany J.S. to her classroom, Ms. Brown testified that Ms. Boatright told her that J.S. and Mr. Faircloth were not in her classroom when they were supposed to be. *See* Brown Dep. at 22–23. Ms. Brown asserts that she told Principal Smith at least twice that J.S. was being removed from the classroom, but there remains an issue of fact as to whether Ms. Brown spoke with Principal Smith again after learning from Coach Barton, Coach Sunday, and Angela Brockman, another special education teacher, that it was an "ongoing habit." *See Id.* at 30–31; Smith Dep. at 72 (denying that Ms. Brown informed her a second time that Mr. Faircloth was continuing to bring J.S. to the weight room). Ms. Brown testified that she spoke with Mr. Faircloth and informed him that taking J.S. to the weight room was against his IEP, but that she did not speak with him again because she did not feel it was her responsibility to reprimand him. *See* Brown Dep. at 26, 30–32, 80–81. Moreover, Ms. Brown did

20

not ask J.S. what was happening in the weight room and, although she was in "constant," daily contact with J.S.' mother, she did not inform J.S.' parents of what was happening. *See id.* at 33–34, 118–19. Given these factual disputes and her apparent failure to follow up with Mr. Faircloth or speak with J.S. or his parents, there is sufficient evidence from which a reasonable jury could conclude that Ms. Brown's actions were clearly unreasonable.

As for Ms. Boatright, she testified that J.S. and Mr. Faircloth were often "in and out" of her classroom. *See* Boatright Dep. at 21–23. Although it is unclear whether Ms. Boatright knew that Mr. Faircloth was taking J.S. to the weight room specifically, *see* Boatright Dep. at 29, 43–44, 54, she knew J.S. was often not in her classroom as required. According to Ms. Brown, she and Ms. Boatright had a conversation about the fact that J.S. was not in Ms. Boatright's classroom and Ms. Boatright agreed that she should speak with Principal Smith because she was responsible for teaching J.S. *See* Brown Dep. at 71–72. But Ms. Boatright did not report J.S.' removal from the classroom to Principal Smith. Nor did she ever ask J.S. about what occurred when Mr. Faircloth took him out of the classroom, or speak with Mr. Faircloth about it. *See* Boatright Dep. at 45–46, 85. Viewing the evidence in the light most favorable to J.S., a reasonable jury could conclude that Ms. Boatright had knowledge that J.S. was being removed from the classroom and that she reacted in a manner that was clearly unreasonable under the circumstances.

21

## C

J.S. also argues that Coach Barton and Coach Sunday were appropriate persons that could bind the school district, arguing that they "could have, at the very least, tried to deter Mr. Faircloth from bringing J.S. . . . to the weight room" and that they had authority to instruct Mr. Faircloth to return J.S. to his regular classroom. *See* Br. of Appellant at 58. Unlike the classroom teachers, however, the record does not contain sufficient evidence from which a reasonable jury could conclude that Coach Barton and Coach Sunday had the authority to take corrective actions to stop Mr. Faircloth.

Ms. Whitfield testified that the coaches had supervisory authority over Mr. Faircloth "to the extent that they were providers of [J.S.'] IEP, and the services in his IEP." *See* Whitfield Dep. at 54. She also testified that either coach "could have" told Mr. Faircloth to take J.S. back to his regular classroom, and that she believed that—based on her "own personal ethical and moral principles"— Mr. Faircloth "should have" complied with such instructions. *Id.* at 50–53. But J.S. has not pointed to any evidence suggesting that physical education teachers and coaches in the school district, like general and special education teachers, maintained a supervisory role over assigned aides. Coach Barton, for his part, testified that he was never told that he was responsible for communicating with J.S.' parents directly. *See* Barton Dep. at 78–79. And although each coach was

22

listed on at least one of J.S.' IEPs, J.S. has not presented evidence that they served a supervisory role similar to, or with the same level of involvement as, Ms. Boatright, the teacher responsible for 80 percent of J.S.' school day, or Ms. Brown, J.S.' case manager.

We recognize that Coach Barton and Coach Sunday could have—and indeed, likely should have—informed someone that they had frequently observed Mr. Faircloth and J.S. in the weight room. But the record does not reflect that they were "high enough up the chain-of-command" for their actions to "constitute an official decision by the school district itself not to remedy the misconduct." *Broward Cty.*, 604 F.3d at 1255 (quoting *Floyd*, 171 F.3d at 1264).

## V

As for J.S.' assertion that the School Board is liable for Mr. Faircloth's alleged verbal and physical abuse of J.S., we again borrow from Title IX deliberate indifference case law to guide our analysis. *See Liese*, 701 F.3d at 347. Having already concluded that there remains a genuine issue of fact as to whether Principal Smith, Ms. Brown, and Ms. Boatright were appropriate persons with actual notice of J.S.' removal from his classroom and whose responses were clearly unreasonable, we must determine whether the "substance of that actual notice [was] sufficient to alert the school official of the possibility" of the verbal and physical abuse. *Broward Cty.*, 604 F.3d at 1254.

23

J.S. argues that his removal from the classroom created the opportunity for Mr. Faircloth to abuse him. In the Title IX context, we have held that "lesser harassment may still provide actual notice of [ ] violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter." *Id.* at 1258. For example, in *Broward County*, we held that knowledge of prior instances of sexual harassment of two students by a teacher served as actual notice of the possibility of that teacher's sexual assault of another student. *See id.* at 1259. Similarly, in *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), the prior groping of female employees by a college basketball player was sufficient to allege actual notice of the possibility of a later violent sexual assault that occurred in that player's dorm room. *See id.* at 1294–95; *id.* at 1304–05 (Jordan, District Judge, concurring). In contrast, comments made to a group of students during class did not serve as sufficient notice of the possibility of a teacher's sexual relationship with a student. *See Gebser*, 524 U.S. at 291–92. Nor was there actual notice of potential sexual molestation based on prior allegations of a teacher's touching during a touch football game and perceived imminent touching at a public water fountain. *See Davis v. DeKalb Cty. Sch. Dist.*, 233 F.3d 1367, 1372–73 (11th Cir. 2000).

The record does not establish (or create a jury issue) that knowledge that Mr. Faircloth was removing J.S. from his classroom and bringing him into the

24

weight room would apprise his teachers or the principal of the possibility that Mr. Faircloth was also abusing J.S. *See* Boatright Dep. at 51, 53–54, 60–61; Barton Dep. at 26, 29, 40, 70, 84–85; Sunday Dep. at 33–34. At most, the facts demonstrate that any school officials who could be deemed "appropriate persons" were aware that Mr. Faircloth was inattentive, or even careless, with J.S. But, similar to the incidental touching and inappropriate comments in *Davis* and *Gebser*, no reasonable jury would find that this conduct alerted those school officials to the possibility of abuse.

## VI

There are genuine issues of fact as to whether the School Board was deliberately indifferent to discrimination regarding J.S.' removal from the classroom, but there is insufficient evidence from which a reasonable jury could conclude that the School Board had notice of the possibility of alleged verbal and physical abuse against J.S. Accordingly, we affirm in part and reverse in part the district court's order granting summary judgment to the School Board, and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.