**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13197

Non-Argument Calendar

————————————

YVONNE M. WEST,
   individually and as administrator of
   the estate of Jamon West,

*Plaintiff-Appellant,*

*versus*

FIREFIGHTER JONAH LAKATOS, et al.,

*Defendants,*

DEKALB COUNTY, GEORGIA,
CAPTAIN PHILLIP DITMORE,
SENIOR FIREFIGHTER DAVID KELLY,
SENIOR FIREFIGHTER JASON WINKLER,
SENIOR FIREFIGHTER KEVIN FLEMING, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-01907-LMM

———————————

Before LUCK, KIDD, and ANDERSON, Circuit Judges.

PER CURIAM:

Yvonne West brought claims against DeKalb County, Georgia, and several of its firefighters and police officers under Title II of the Americans with Disabilities Act and 42 U.S.C. section 1983 on behalf of her son, Jamon West, who died as the result of a medical intervention by DeKalb County's firefighters and police officers. The district court granted the defendants' motions to dismiss after concluding that the complaint failed to state a claim under the ADA, failed to state a failure-to-train claim against the county under section 1983, and failed to overcome the individual defendants' qualified immunity. After careful review, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are recounted in the light most favorable to the plaintiff. Jamon West, who suffered from a seizure disorder, lived with his mother. On August 16, 2019, West was at his mother's home when he suffered "an episode of behavioral crisis," known as "excited delirium," a "phenomenon associated with certain types of substance abuse or psychiatric/neurological disorders" where a person shows symptoms like "extreme agitation, hyperactivity, hyperthermia, confusion, and disregard of pain." West "could not control his symptoms and pleaded with his mother to

help him," so she called 911 and told the operator that "her son was having a seizure" and that "she could not control him." When Firefighters Winkler and Lakatos initially responded to the call, West appeared "highly agitated, hyperactive, confused, and not in control of his behavior."

Firefighters Winkler and Lakatos restrained West "in a prone position, face down on the ground" with the help of fire department Captain Ditmore and Firefighters Kelly, Van Wie, and Fleming, who arrived shortly after Winkler and Lakatos had started restraining West. "[F]our or five firefighters appl[ied] force to all four [of West's] extremities and to his back." West's mother cried for the firefighters to stop because her son couldn't breathe with his face pressed in the grass. One of the firefighters told West's mother "that she would be arrested if she did not back away." Captain Ditmore then "took command of the scene," directing Firefighter Payne to inject West with a "chemical restraint." Firefighter Payne gave West the maximum dosage permitted by county policy of two sedatives, Haldol and Versed.

After the firefighters had given West the sedatives, county police officers arrived. Captain Ditmore asked the police to handcuff West. Police Officers Lattimore and Williams handcuffed West's hands behind his back with Captain Ditmore's assistance. Captain Ditmore walked away to make a status report by radio. The officers left West "in a prone position with his hands cuffed behind his back," and West continued to be restrained "in this manner long enough for the sedatives to take effect." After Captain

Ditmore finished his call and "observed that . . . West was calm," he "ordered the handcuffs removed and replaced with soft restraints." As the defendants began to transport West across his mother's yard, "his respiratory rate dropped and he went into cardiac arrest." West was transported to the hospital, fell into a coma, and died a few days later. After performing an autopsy, the county medical examiner concluded that West had "died of '[d]elayed complications of cardiorespiratory arrest due [to] probable excited delirium and physical restraint," describing West's death as a homicide.

The fire department's policy manual warns that a potential side effect of Haldol and Versed includes "respiratory depression and the inability to maintain an airway." The manual also says that patients with excited delirium "should never be oriented in a prone position" and should only be restrained with "soft medical restraints." Unlike the fire department's policies, the police department's policies did not prohibit prone restraint or the use of handcuffs on a person with excited delirium. DeKalb County officials conducted an internal investigation and determined that the first responders involved in West's death had complied with county policy.

On behalf of West's estate, West's mother sued the county and the firefighters and police officers who responded to her 911 call, alleging violations of Title II of the Americans with Disabilities Act, and violations of West's constitutional rights under section 1983. Relevant to this appeal, the complaint alleged five counts:

(1) failure to modify policies, in violation of the Act, against the county (count one), (2) failure to accommodate, in violation of the Act, against the county (count two), (3) failure to train under section 1983 against the county (count 3), (4) excessive force, in violation of the Fourth Amendment, under section 1983 against Captain Ditmore, Firefighters Lakatos, Winkler, Kelly, Van Wie, and Fleming, and Police Officers Lattimore and Williams (count four), and (5) deliberate indifference to medical needs, in violation of the Fourteenth Amendment, under section 1983 against Captain Ditmore and Firefighter Payne (count five).

The defendants moved to dismiss all counts, arguing that Ms. West failed to state a claim under Act, could not establish municipal liability against the county under section 1983, and failed to overcome the individual defendants' qualified immunity. The district court granted the defendants' motions in full.[1]

As to the failure-to-modify claim, the district court determined that Ms. West failed to state a claim because she improperly sought to establish the county's vicarious liability for its employees'

---

[1] The district court also dismissed a failure-to-intervene claim under section 1983 against all individual defendants. Because Ms. West does not argue on appeal that the district court erred in dismissing the failure-to-intervene claim, she has abandoned that issue. *See United States v. Campbell*, 26 F.4th 860, 871 (11th Cir. 2022) (en banc) ("Typically, issues not raised in the initial brief on appeal are deemed abandoned."); *Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants [us] to address should be specifically and clearly identified in the brief. . . . Otherwise, the issue—even if properly preserved at trial—will be considered abandoned.").

actions and the proposed modification would not have been reasonable under the circumstances.  As to the failure-to-accommodate claim, the district court concluded that Ms. West improperly sought to impute the first responders' actions to the county.  As to the failure-to-train claim, the district court ruled that Ms. West failed to include enough facts to establish that the alleged failure to train was the result of deliberate indifference by county policymakers.  Finally, as to the section 1983 claims for excessive force and deliberate indifference to medical needs, the district court explained that Ms. West could not overcome the individual defendants' qualified immunity because she hadn't shown that any of the first responders violated clearly established law.

## II.  STANDARD OF REVIEW

We review de novo an order dismissing a complaint, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).  We review de novo a determination that an official is entitled to qualified immunity. *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1343 (11th Cir. 2013).

## III.  DISCUSSION

### A.  THE CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT

#### 1.  *The failure-to-modify claim (count one)*

Ms. West first challenges the district court's dismissal of the failure-to-modify claim under the Americans with Disabilities Act. Under Title II of the Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To state a claim under Title II, the plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of [his] disability." *Ingram v. Kubik*, 30 F.4th 1241, 1256–57 (11th Cir. 2022) (alteration accepted) (quoting *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019)).

Where, as here, a plaintiff seeks compensatory damages for discrimination under the Act, the plaintiff must further show "intentional discrimination, which requires a showing of deliberate indifference." *Id.* at 1257 (quoting *Silberman*, 927 F.3d at 1134).  This is an "exacting standard." *Silberman*, 927 F.3d at 1134 (internal quotation marks omitted) (quoting J.*S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017)).  Deliberate

indifference requires proof that "'the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood.'" *Id.* (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)).

Under Title II, a governmental entity cannot be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. *See Ingram*, 30 F.4th at 1259. In order to demonstrate intentional discrimination by a governmental entity, "the plaintiff must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf' had 'actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond.'" *Silberman*, 927 F.3d at 1134 (alterations adopted) (quoting *Liese*, 701 F.3d at 349). The official "needn't be so high up the chain of command that she is 'authorized to set an entity's policy'" but nevertheless "must be 'high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] itself not to remedy the misconduct.'" *Id.* (alterations and quotation omitted).

Here, the fire department's policies already provided that an individual experiencing excited delirium "should never be oriented in a prone position" and "only soft medical restraints" should be used, so it is unclear what further modification Ms. West seeks as to the fire department's policies. To the extent Ms. West seeks a modification of the police department's policies, which do not prohibit either prone restraint or behind-the-back handcuffing of

persons with excited delirium, the claim still fails because Ms. West does not identify *any* official who had both actual knowledge of the deficiency as well as the authority to address the alleged discrimination and institute corrective measures on the county's behalf. *See Liese*, 701 F.3d at 349 ("'[F]or liability to attach, there must be (1) 'an official' who, (2) 'at a minimum,' has the requisite knowledge and authority." (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998))).

None of the first responders at the scene had the requisite knowledge and authority. The claim is based on a failure to modify the county's policies, but there is no indication that the first responders—the officials on the ground—had any ability to affect policies at the county level. *See Silberman*, 927 F.3d at 1136 (holding that "[t]he relevant question is not whether [the official] had 'complete discretion' to make the initial decision to deny [the plaintiff] service, but rather whether they had discretion at a 'key decision point *in the administrative process'*" (alteration accepted)). And even if the first responders were empowered to make decisions on the ground, Ms. West does not allege that they had discretion at any point in the administrative process to affect the county's policies. *Id.* at 1134–35 (finding that individual bus drivers were not qualifying officials under the ADA where plaintiff alleged that transportation authority's practices, policies, and procedures discriminated on the basis of disability).

### 2. The failure-to-accommodate claim (count two)

Ms. West next challenges the district court's dismissal of the failure-to-accommodate claim, arguing that Captain Ditmore was a qualifying official with "substantial supervisory authority" to provide reasonable accommodations, making the county liable for the alleged failure to accommodate. Even if that were true, the failure-to-accommodation claim fails because the Act does not apply to medical treatment decisions and West never requested an accommodation.

The Act does not apply to medical treatment decisions, which form the essence of West's claim. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) ("[T]he ADA [ ] was never intended to apply to decisions involving . . . medical treatment" (first citing *United States v. Univ. Hosp., State Univ. of N.Y.*, 729 F.2d 144, 156 (2d Cir. 1984); and then citing *Johnson v. Thompson*, 971 F.2d 1487, 1493–94 (10th Cir. 1992))). Here, the first responders arrived at the scene for the purpose of administering emergency medical aid, not to arrest West for a crime. And the core of the failure-to-accommodate claim is that the first responders made the wrong treatment decisions in responding to the medical emergency: knowing that West was experiencing seizure-induced excited delirium, they should not have used behind-the-back handcuffs in a prone position to restrain him after they administered sedatives. But Ms. West cannot base a claim under the Act on allegations that first responders should have made different treatment decisions while administering emergency medical aid. *Id.*

Even assuming that the Act applies to these facts, we have held that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made[.]" *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  Here, there is no indication that West or his mother requested an accommodation for West's disability.  Ms. West alleged that "a specific request was not necessary to inform DeKalb County's officers" of West's need for an accommodation because "the need for such accommodations is so widely recognized in the law enforcement community . . . ."  But we have never held that a plaintiff may maintain a reasonable accommodation claim where the plaintiff never requested an accommodation.  To the extent Ms. West argues that the first responders should have known that West required an accommodation on the basis of general law enforcement standards, we have explicitly rejected claims under the Act based on a should-have-known constructive notice theory of liability because "discrimination cannot be based on the constructive knowledge of the decisionmaker, or what the decisionmaker should have known."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1175 (11th Cir. 2005) (internal quotation marks omitted).

## B.  THE SECTION 1983 CLAIMS

### 1.  *The section 1983 failure-to-train claim (count three)*

Ms. West next challenges the district court's dismissal of the failure-to-train claim, arguing that the complaint adequately alleged that county policymakers had "actual knowledge of the increased risk of death that prone restraints and behind-the-back

handcuffing create for excited delirium patients, reflected in [fire and police department] policies regarding excited delirium."

Section 1983 creates a cause of action against any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, [who] subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Under section 1983, a municipality cannot be held vicariously liable for the actions of its employees. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 660 (1978). A plaintiff may maintain a section 1983 claim against a municipality "only where the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). It is only when "execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under [section] 1983." *Monell*, 436 U.S. at 694.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A failure-to-train claim will lie only where the "inadequate training can justifiably be said to represent '[municipal] policy.'" *Canton*, 489 U.S. at 390. And that occurs "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. This is a "high bar." *Simmons v. Bradshaw*, 879 F.3d 1157, 1169 (11th Cir. 2018). To meet it, a plaintiff must show that

the municipality (1) had notice of a need to train and (2) made a deliberate choice not to do so. *See Gold v. City of Miami*, 151 F.3d 1346, 1350–51 (11th Cir. 1998) (collecting cases).

A plaintiff can show notice one of two ways. It is "'ordinarily necessary'" to show "[a] pattern of similar constitutional violations by untrained employees" to demonstrate notice. *Connick*, 563 U.S. at 62 (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). Alternatively, "in a narrow range of circumstances," *Bryan Cnty.*, 520 U.S. at 409, a plaintiff may demonstrate notice without a pre-existing pattern of violations where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," *Canton*, 489 U.S. at 390. The Supreme Court has put forward only one hypothetical instance where that might be the case: training in the use of deadly force where firearms are provided to police officers. *See id.* at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.").

Ms. West does not allege (or identify on appeal) any similar prior incidents. Instead, Ms. West argues that the district court

wrongly concluded that need for training was not "so obvious" that a failure to train would result in a constitutional violation. According to Ms. West, the fact that the county (like other municipalities) has policies addressing the connection between excited delirium and prone restraint demonstrates "actual knowledge on the part of [c]ounty policymakers that improper restraint of persons with excited delirium may lead to respiratory depression and cardiac arrest."

But Ms. West cannot extrapolate a failure-to-train claim from the existence of policies on the same subject matter. Again, Ms. West does not identify any prior incidents where a lack of training on the policy resulted in a constitutional violation. Nor does the existence of a policy automatically suggest that policymakers implemented it because they knew that a particular practice was likely to result in constitutional violations. That theory would create liability whenever a municipality does not train on an existing policy, turning "failure to train" into "a talismanic incantation producing municipal liability '[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee'" when a corresponding policy exists. *Connick*, 563 U.S. at 74 (Scalia, J., concurring) (quoting *Canton*, 489 U.S. at 392; *see also Canton*, 489 U.S. at 392 (noting that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a [section] 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." (citation omitted)).

Turning to the specific practices at issue here, Ms. West does not actually allege that the use of prone restraints or behind-the-back handcuffing on individuals with excited delirium was "so obvious" that liability attaches for a single incident. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1329 (11th Cir. 2015) (rejecting failure-to-train claim where the complaint "d[id] not allege that the need for specialized training in the constitutional restrictions on the use of force when dealing with mentally ill citizens [wa]s 'so obvious' that the failure to provide such training amounts to deliberate indifference"). And even if she did, training in the proper use of restraints on individuals with excited delirium "falls far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the [county]." *Canton*, 489 U.S. at 396–97 (O'Connor, J., concurring in part and dissenting in part) (finding no obvious need to train police in diagnosing mental illness); *Gold*, 151 F.3d at 1351–52 (finding no obvious need to train police on how to address handcuff complaints); *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d at 1293–94 (11th Cir. 2009) (finding no obvious need to train police on the use of hobble ties based on single incident where individual experiencing excited delirium died of respiratory arrest after police restrained him with hobble ties in a prone position).

### 2. The section 1983 excessive-force claim (count four)

Ms. West next challenges the district court's determination that qualified immunity shielded the individual defendants from the excessive-force claim, arguing that she adequately pleaded that

the individual defendants violated clearly established law. The Fourth Amendment guarantees that "the right of the people . . . against unreasonable searches and seizures [ ] shall not be violated." U.S. CONST. Amend. IV; *see also Torres v. Madrid*, 592 U.S. 306, 314 (2021) ("[T]he Fourteenth Amendment . . . incorporated the protections of the Fourth Amendment against the States."). "[T]he application of physical force to the body of a person with intent to restrain is a seizure." *Torres*, 592 U.S. at 325. "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" *Id*. (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

Qualified immunity protects a state official from suit under section 1983 when the official was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). Here, it's undisputed that the individual defendants were acting within their discretionary authority.

Once "the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Christmas v. Harris*

24-13197               Opinion of the Court                    17

*Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022).  Government officials "are entitled to qualified immunity under [section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) ("To deny qualified immunity at the motion to dismiss stage, we must conclude both that the allegations in the complaint . . . establish a constitutional violation and that the constitutional violation was clearly established." (internal quotation marks omitted)).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, the district court determined that the individual defendants were entitled to qualified immunity based on the clearly established prong.

A constitutional right is clearly established "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  There are three ways to show a right is clearly established:  (1) materially similar case law, (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1291–92 (citations omitted).  "Notwithstanding the availability of these

three independent showings, this Court has observed on several occasions that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019) (quotation omitted).

Ms. West contends that Captain Ditmore, Firefighters Lakatos, Winkler, Kelly, Van Wie and Fleming, and Police Officers Lattimore and Williams used excessive force by placing West into a prone position in combination with behind-the-back handcuffing while he was experiencing excited delirium and after they had administered a sedative, in violation of the "broad principle" that "deadly force cannot be used in non-deadly situations." It's true that we have recognized a general principle that "police officers cannot use force that is 'wholly unnecessary to any legitimate law enforcement purpose,'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005) (quoting *Lee*, 284 F.3d at 1196), and therefore "deadly force cannot be employed in a situation that requires less-than-lethal force," *id*. at 1159–60 (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). But cases where this principle has overcome qualified immunity are far different from the one presented here. In *Tennessee v. Garner*, a police officer shot an unarmed fleeing suspect in the back of the head. *See* 471 U.S. at 11–12. In *Bradley v. Benton*, police fired a stun gun at an unarmed fleeing suspect while he was perched precariously on top of an eight-foot wall. *See* 10 F.4th 1232, 1241 (11th Cir. 2021). And in *Mercado v. City of Orlando*, a police officer fired a blunt projectile launcher at an individual's head from short range. 407 F.3d at 1158–61. In all of these cases, state officials

used force that was so obviously deadly and so obviously unnecessary under the circumstances that any reasonable officer would have known that his actions violated the Fourth Amendment.

But not every exercise of force that results in death is an exercise of deadly force sufficient to overcome qualified immunity. We have held force similar to that exercised here not to violate clearly established law even when it resulted in death. In *Lewis v. City of West Palm Beach*, for example, we concluded that officers did not violate clearly established law when they physically restrained an individual experiencing excited delirium in a prone position with his hands and feet "hogtied" behind his back while an officer restrained him by placing a knee on the his upper back and neck, resulting in his death from asphyxia. 561 F.3d at 1291–92. Similarly, in *Garrett v. Athens-Clarke County*, police encountered a subject displaying violent and erratic behavior while resisting arrest. 378 F.3d 1275–78 (11th Cir. 2004). Police pepper-sprayed him and restrained him in a prone position with his hands and feet behind his back in a bowed position, causing the individual to die from "positional asphyxia." *Id.* There, we likewise held that the "defendants' acts were not so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer, facing the circumstances, would have known that the acts violated the pre-existing federal law." *Id.* at 1281.

Here, when the first responders found West and began rendering medical aid, he was "highly agitated, hyperactive, confused, and not in control of his behavior." They restrained him in a prone

position, then handcuffed him, and administered sedatives.  Once the sedatives took effect and West was calm, they replaced the handcuffs with soft restraints and took West out of the prone position to transport him across his mother's yard.  It was only then that West's respiratory rate began to drop and he went into cardiac arrest.  Under the circumstances, we cannot conclude that these actions were "so far beyond the hazy border between excessive and acceptable force that [first responders] had to know [they were] violating the Constitution even without caselaw on point."  *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).

### 3. *The section 1983 deliberate-indifference claim (count five)*

Last, Ms. West challenges the district court's dismissal of the deliberate-indifference-to-medical-need claim, arguing that Captain Ditmore and firefighter Payne are not entitled to qualified immunity because they violated clearly established law.  The Fourteenth Amendment Due Process Clause requires government officials "to provide medical care to persons . . . who have been injured while being apprehended by the police."  *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).  This requirement is coextensive with the prohibition on deliberate indifference to a convicted prisoner's serious medial needs under the Eighth Amendment's Cruel and Unusual Punishments Clause.  *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (holding that "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees" for claims of deliberate indifference to medical need under the Fourteenth Amendment).

In order to state a claim for deliberate indifference to medical need, the plaintiff must demonstrate (1) "that he suffered a deprivation that was, 'objectively, sufficiently serious,'" and (2) that the "the defendant acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). As for subjective recklessness, the plaintiff "must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1262. However, "even if the defendant actually knew of a substantial risk, he cannot be found liable . . . if he responded reasonably to the risk. *Id.* (citation modified). "[M]ere negligence or a mistake in judgment does not rise to the level of deliberate indifference." *Mann*, 588 F.3d at 1308.

Ms. West failed to demonstrate that Captain Ditmore and Firefighter Payne violated clearly established law regarding deliberate indifference to medical need. First, Ms. West does not point to any authority establishing that the Fourteenth Amendment Due Process Clause deliberate-indifference standard applies beyond police arrests to first responders rendering emergency medical aid solicited by a family member, as was the case with Captain Ditmore

and Firefighter Payne here.  Second, even if she could demonstrate that the deliberate-indifference standard applies here, West does not point to any case law, articulate any broad principles, or argue that defendants' behavior was obviously egregious to demonstrate that Captain Ditmore and Firefighter Payne violated clearly established law.  *See Lewis*, 561 F.3d at 1292 (citations omitted).  Instead, Ms. West argues that the district court erred because the proper use of restraints on an individual experiencing excited delirium "is the type of thing Ditmore and Payne should have known by reading their policy manuals or by getting adequate emergency medical training, not by reading case law."  But policies are not law, and neither we nor the Supreme Court have ever held that an official entity's policies could by themselves suffice to create clearly established law for the purposes of section 1983 liability in a deliberate indifference claim.

Ms. West pushes back, citing *Lombardo v. City of St. Louis*, 594 U.S. 464 (2021), for the proposition that policy guidance "may suffice to inform an officer that his conduct is unlawful in the circumstances."  But *Lombardo* dealt solely with the first prong of the qualified immunity inquiry, considering whether police officers used unconstitutionally excessive force under the circumstances and noting that "well-known police guidance" may be one of many factors that a district court could consider in determining whether police used reasonable force under the circumstances.  *See id.* at 467.  But *Lombardo* did not hold that departmental policies can by themselves demonstrate a constitutional violation, let alone that such policies suffice to create clearly established law sufficient to

24-13197          Opinion of the Court          23

overcome qualified immunity in a deliberate-indifference-to-medical-need claim.

Because Captain Ditmore and Firefighter Payne did not violate any clearly established law regarding deliberate indifference to medical need, Ms. West cannot overcome their qualified immunity at the dismissal stage.

**AFFIRMED**.