**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| D. D., a minor, by and through his Guardian Ad Litem, Michaela Ingram,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>*Defendant-Appellee.* | No. 19-55810<br><br>D.C. No.<br>2:19-cv-00399-PA-PLA<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted June 2, 2020
Pasadena, California

Filed December 31, 2020

Before: Kermit V. Lipez,[*] Johnnie B. Rawlinson, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Lipez;
Dissent by Judge Rawlinson

---

[*] The Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, sitting by designation.

## SUMMARY[**]

### Americans with Disabilities Act

The panel vacated the district court's dismissal of an action brought by a student under Title II of the Americans with Disabilities Act and remanded for further proceedings.

The student alleged that the Los Angeles Unified School District denied him equal access to a public education because of his disability, and the district court dismissed his complaint on the ground that he failed to exhaust his claim through the administrative procedures prescribed by the Individuals with Disabilities Education Act ("IDEA"), as required when a plaintiff seeks relief under other federal statutes for the denial of a free appropriate public education ("FAPE").

The panel held that the gravamen of the student's ADA claim was discrimination separate from his right to a FAPE. Hence, his ADA claim was not subject to IDEA exhaustion. The panel closely examined the complaint and determined that its allegations concerned the denial of access to public facilities, rather than the denial of a FAPE. The panel further concluded that a different result was not required by *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017), pursuant to which the panel considered (1) whether the plaintiff could bring the same claim outside the school setting and whether an adult or school visitor could bring the same claim within the school setting and (2) the history of the proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Rawlinson disagreed with the majority's application of *Fry* to the facts of this case. She wrote that exhaustion was required because the claims for relief in the amended complaint were premised on asserted violations of the IDEA.

**COUNSEL**

Patricia A. Van Dyke (argued) and Janeen Steel, Learning Rights Law Center, Los Angeles, California; Shawna L. Parks, Law Office of Shawna L. Parks, Los Angeles, California; for Plaintiff-Appellant.

Matthew R. Hicks (argued) and Michele M. Goldsmith, Bergman Dacey Goldsmith, Los Angeles, California, for Defendant-Appellee.

Andria Seo, Lauren Lystrup, and Carly J. Munson, Disability Rights California, Los Angeles, California, for Amici Curiae California Association of Parent-Child Advocacy, Disability Rights Advocates, Disability Rights California, National Center for Youth Law, and National Disability Rights Network.

**OPINION**

LIPEZ, Circuit Judge:

Appellant D.D., an elementary school student who has attention deficit hyperactivity disorder ("ADHD") and severe, disability-related behavioral issues, brought this action pursuant to the Americans with Disabilities Act ("ADA") alleging that the Los Angeles Unified School District ("the District") denied him "equal access to [a]

public education" because of his disability. D.D. seeks damages for harms stemming from his repeated exclusion from school and for abusive treatment he experienced when he attended. The district court dismissed D.D.'s complaint on the ground that he failed to exhaust his claim through the administrative procedures prescribed by the Individuals with Disabilities Education Act ("IDEA"), as required when a plaintiff seeks relief under other federal statutes for the denial of a free appropriate public education ("FAPE"). *See* 20 U.S.C. §§ 1400, 1415(*l*).

Having appellate jurisdiction pursuant to 28 U.S.C. § 1291, we vacate that dismissal. A close review of D.D.'s allegations reveals that the gravamen of his ADA claim is discrimination separate from his right to a FAPE. Hence, his ADA claim is not subject to IDEA exhaustion. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017).

## I. FACTUAL BACKGROUND[1]

D.D. is an elementary school student whose "disability-related behaviors ranged from being off-task and impulsive to being physically aggressive toward peers and adults." As early as kindergarten (the 2015–2016 school year), D.D.'s mother was regularly called to take him home early from school "because his 'behaviors interfered [with] the other students.'" D.D.'s mother requested a one-to-one aide "to accommodate D.D.'s needs and enable him to participate with his peers," but the request was denied. D.D. transferred

---

[1] We draw our factual summary from the well-pleaded allegations in the complaint, which we take as true, *see Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019), from the "Request for Mediation and Due Process Hearing" that triggered administrative proceedings pursuant to the IDEA, and from the Final Settlement Agreement and Release that concluded those proceedings.

to a different school for first grade, but his behavior worsened. He struck himself, his classmates, and school staff members. D.D. left the classroom regularly and, at times, caused property damage, "once punching a classroom fire extinguisher."

Early in the first-grade year, D.D.'s mother was given "an ultimatum": she could either retrieve D.D. from school because of his "disruptive, disability-related behaviors," or have a family member serve as his one-to-one aide in the classroom. Both D.D.'s mother and her partner, Albert, worked full-time jobs, but they decided that Albert would leave his job to serve as D.D.'s aide. However, late in the school year, on a day that Albert was unavailable, D.D. had a "severe behavioral incident" that prompted the school to summon a Psychiatric Emergency Team ("PET team"). The episode subsided before the PET team arrived at the school, and D.D.'s mother took him home. That evening, the PET team came to the family's home and informed D.D.'s parents that he needed to be placed on a 24-hour psychiatric hold at a hospital. Ultimately, D.D. spent seven days at the facility. After this incident, D.D.'s mother again unsuccessfully requested a one-to-one aide for him.

D.D.'s behavioral issues persisted through the second grade, even with Albert accompanying him on most days. His mother again sought accommodations, including a one-to-one aide or placement in a non-public school, which were denied. A particularly serious episode occurred in October 2017, when D.D. threw a chair and a water bottle, the latter hitting a classroom aide. The aide took D.D. out of the classroom so he could calm down, and, while outside, D.D. "stumbled down a few stairs." Upon his return to the classroom, D.D. claimed that the aide had pushed him down the stairs. The school principal called the police, who

interviewed D.D. at school.  His parents were not called.  The episode left D.D. emotionally shaken.

After this incident, school staff members routinely taunted D.D., "telling [him] that if he did not behave, they would call the police and he would end up either in jail or in the hospital again."  These threats traumatized D.D. and caused "lasting emotional harm, making it impossible for him to attend school altogether."  At the end of November 2017, D.D.'s mother withdrew him from school for several weeks.  In mid-December, he re-enrolled in his original elementary school, but his circumstances did not improve. "He commonly left class and walked around the campus for almost the entire school day unattended."

In January 2018, D.D. was referred to a non-public school with a small program and more adult assistance.  That placement initially improved his academic experience, but he was routinely bullied on the bus and, on three occasions, he arrived home from school with noticeable bruises on his face.  Two of those episodes involved attacks by other students; on the third occasion, a staff member slammed D.D.'s face against a wall when he became aggressive.  D.D. stopped attending school at the end of May "because [his mother] feared for his safety."  He enrolled in a new non-public school in September 2018.

Meanwhile, in March 2018, D.D.'s mother had requested a due process hearing before California's Office of Administrative Hearings, Special Education Division, consistent with the requirements of the IDEA.**2**  *See* 20 U.S.C. § 1415(f).  The 43-page "Request for Mediation

---

**2** D.D. was the "petitioner" filing the Request, which was prepared and submitted by an attorney.

& Due Process Hearing" described in detail the District's asserted failures to provide D.D. with the evaluations, services, and programs necessary to provide him with a FAPE, despite the goals and assessments specified in his individualized education program ("IEP").**3**  The Request noted that, in addition to his behavior issues and ADHD, D.D. "has need in the areas of communication and fine motor skills, for which he has received language and speech ("LAS") therapy and occupational therapy ("OT")."  The Request stated that, for the 2015–2016 and 2016–2017 school years, the District had failed, *inter alia*, to provide D.D. with a "one-to-one behavior aide or behavior intervention implementation ("BII") services."

The Request also asserted a litany of educational deficits resulting from the alleged inadequate provision of services. For example, the document stated that, as of December 2016, when D.D.'s IEP Team met for its annual review, "[h]e had not met any of his goals[] in the areas of find[sic] reading, writing, expressive language, math, and behavioral support." As of October 2017, his IEP indicated that he had met his math and reading goals, but not his goals in writing, expressive language, occupational therapy, or behavior support.  The Request reported that D.D.'s mother had asked the IEP Team at that time to consider a one-to-one

---

**3** An IEP is "a comprehensive statement of the educational needs of a . . . child [with a disability] and the specially designed instruction and related services to be employed to meet those needs." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).  The plan is "[c]rafted by a child's 'IEP Team'— a group of school officials, teachers, and parents." *Fry*, 137 S. Ct. at 749 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)).  A child's IEP is intended to ensure that he receives a FAPE. *See id.*  D.D.'s initial IEP was formulated in March 2015, i.e., before he started kindergarten.

behavioral aide or moving D.D. to a non-public school. The IEP Team declined both options.

The Request identified thirteen "problems" that needed to be addressed. Problems One through Five listed deficiencies that allegedly denied D.D. a FAPE from February or March 2016 through the present (i.e., early 2018), including the failure to provide behavioral, speech and language, psychological, and social-skills services. Problems Six through Nine disputed different assessments of D.D. performed by the District, noted the failure to reevaluate his occupational therapy needs, and requested independent evaluations at public expense. Problems Ten and Eleven asserted that the District had failed to offer D.D. a FAPE in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and Problem Twelve stated that the District "violated Section 504 of the Rehabilitation Act and the Americans with Disabilities Act when it discriminated against [D.D.] on the basis of his disability." Problem Thirteen asserted a violation of a state civil rights statute (the "Unruh Civil Rights Act").

In the Requested Remedies section of the document, D.D.'s mother sought an order directing the District to provide eight specified services "as an offer of FAPE," including "a full time, one-to-one behaviorally trained aide by a nonpublic agency," twelve hours per month of "behavior intervention development," and revision of D.D.'s "behavioral support plan."[4] She also sought (1) funding or

---

[4] The other relief requested included: (1) "increased speech and language services to address pragmatic, expressive, and receptive language"; (2) "a social skills program"; (3) "increased occupational therapy services"; and (4) "increased psychological counseling services."

reimbursement for various assessments and evaluations,[5] (2) compensatory education services,[6] (3) damages for violations of the Rehabilitation Act, ADA, and Unruh Civil Rights Act, and (4) "any other remedies deemed appropriate by the hearing officer assigned to this case."

D.D. and the District eventually negotiated a settlement agreement resolving "all educational claims . . . arising under the IDEA, . . . and all California special education statutes and regulations." The six-page agreement expressly did not "release any claims for damages required to be asserted in a court of law and which could not have been asserted in proceedings under the IDEA and/or California special education statutes and regulations," including "any claims that can be made under" the ADA.

In January 2019, D.D. filed this action against the District, alleging violations of the ADA and the Rehabilitation Act. A subsequent amended complaint dropped the Rehabilitation Act claim and sought only damages for disability discrimination under the ADA. The District filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and, as noted above, the district court dismissed the complaint. The court

---

[5] These requests were for: (1) a psychoeducational evaluation, (2) a speech and language assessment, (3) an occupational therapy assessment, and (4) a functional behavior assessment.

[6] The specified compensatory education services included: (1) a minimum of 400 hours of "compensatory specialized academic instruction services," (2) 80 hours of "compensatory occupational therapy services," (3) 80 hours of "compensatory individual speech and language therapy services," (4) 72 hours of "compensatory individual psychological counseling services," and (5) 80 hours of a "social skills program."

accepted the District's argument that D.D.'s federal action "mirrors the . . . due process complaint and does, at the end of the day, seek FAPE relief." Accordingly, the court held that the ADA claim must be exhausted through the administrative process and that, because D.D. had not done so, his complaint must be dismissed without prejudice.

## II. ANALYSIS

### A. Standard of Review

The district court granted the District's motion to dismiss without expressly identifying the complaint's deficiency as lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), or failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6). This court has advised that a challenge to a complaint based on administrative exhaustion, which is an affirmative defense, ordinarily should be addressed through a motion for summary judgment rather than through a motion to dismiss under Rule 12(b). *See Albino v. Baca*, 747 F.3d 1162, 1168, 1171 (9th Cir. 2014) (en banc).[7] We need not dwell on the procedural context, however, because the issue of exhaustion in this case is one of law; the parties dispute the significance of the alleged facts, not the facts themselves. Hence, our review would be de novo regardless of the motion filed. *See id.* at 1171 ("On appeal, we will review the judge's legal rulings on exhaustion de novo[.]"); *N. Cty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009) ("We review de novo questions of law raised in dismissals under Rules 12(b)(1) and 12(b)(6).").

---

[7] Before *Albino*, this court had endorsed using an unenumerated Rule 12(b) motion to seek dismissal of a complaint for failure to exhaust administrative remedies. *See Albino*, 747 F.3d at 1171.

In reviewing Rule 12(b) dismissals, we accept as true the complaint's factual allegations, and we construe those allegations in the light most favorable to the plaintiff. *See N. Cty. Cmty. All.*, 573 F.3d at 741–42; *see also Albino*, 747 F.3d at 1173 (stating that, in reviewing a summary judgment on exhaustion, "we must view all of the facts in the light most favorable to the non-moving party").

## B. Federal Law and School-Based Claims of Disability Discrimination

Three different federal statutes may come into play when a child with disabilities and his family assert education-based claims of unlawful treatment: the IDEA, 20 U.S.C. §§ 1400–51; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("§ 504"); and Title II of the ADA, 42 U.S.C. §§ 12131–34. *See Fry*, 137 S. Ct. at 749–50 (describing the three statutes); *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 909–910 (9th Cir. 2020) (same); *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016) (same). [8]

---

[8] A federal remedy for school-based disability discrimination also may be available via 42 U.S.C. § 1983, which protects every "citizen of the United States or other person within [its] jurisdiction" against deprivations of federally secured rights effected by persons acting under the color of state law. *See, e.g.*, *Fry*, 137 S. Ct. at 750 (noting a § 1983 claim brought under the Equal Protection Clause of the Fourteenth Amendment for the denial of a FAPE); *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 883 (9th Cir. 2011) (en banc) (describing plaintiff's § 1983 claims alleging violations of the Fourth, Eighth, and Fourteenth Amendments), *overruled on other grounds by Albino,* 747 F.3d at 1171; *Doucette v. Georgetown Pub. Sch.*, 936 F.3d 16, 28–29 (1st Cir. 2019) (describing a § 1983 claim alleging a constitutional due process violation).

The IDEA is focused exclusively on special education and "ensure[s] that all children with disabilities have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A)—a FAPE—that encompasses "both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 137 S. Ct. at 748–49 (quoting 20 U.S.C. § 1401(9), (26), (29)). The IEP is the "primary vehicle" for providing a FAPE, *id.* at 749 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)), and "[t]he IDEA provides an administrative process for parents to challenge their child's IEP or its implementation," *Doucette*, 936 F.3d at 22.

Both § 504 and the ADA sweep more broadly than the IDEA, covering claims of discrimination brought by "both adults and children with disabilities, in both public schools and other settings." *Fry*, 137 S. Ct. at 749. Section 504 guarantees nondiscriminatory access to federally funded activities and programs, 29 U.S.C. § 794, and it requires public entities to make "reasonable modifications" to their practices to "accommodate" individuals with disabilities. *See Alexander v. Choate*, 469 U.S. 287, 300 (1985). The ADA is even more comprehensive, guaranteeing non-discriminatory access not only to "the services, programs, or activities" of any "public entity," 42 U.S.C. § 12132, but also to commercial facilities and places of public accommodation, *id.* §§ 12181–84.

Thus, while all three statutes require public schools "to provide each child with meaningful access to education," *Fry*, 137 S. Ct. at 755 (referring to the IDEA); *see K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013) (referring to the ADA), "meaningful access" for purposes of these provisions is not always the same. Under

the IDEA—focused on the schooling itself—a child must be given the individualized learning tools and services that he needs to advance his academic skills, i.e., the capability to "access" learning within his classroom. *See Fry*, 137 S. Ct. at 748–49; *see also McIntyre*, 976 F.3d at 914 (emphasizing that "specially designed *instruction*" is the IDEA's core tool for providing a FAPE (quoting 20 U.S.C. § 1401(29))). Under the ADA and § 504, children with disabilities also must be given reasonable accommodations so they can "access" the school program at all—i.e., to ensure they are not excluded from school or the classroom and, as a result, denied *the opportunity* to obtain the individualized attention necessary to receive an appropriate public education.

Significantly for this case, the IDEA has an exhaustion requirement. If it applies, a parent may not sue a school district under the IDEA unless she has first exhausted the administrative remedies provided by the statute. *See* 20 U.S.C. § 1415(i), (*l*). Although the ADA and § 504 do not themselves have exhaustion provisions, the IDEA's exhaustion requirement is pertinent to those statutes as well. It provides:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, *except that* before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same

> extent as would be required had the action
> been brought under [the IDEA].

*Id.* § 1415(*l*) (emphasis added). This provision has led to disputes over whether the relief a child seeks in a civil action is "also available under [the IDEA]"—requiring exhaustion before the claim may proceed in court—and whether the exhaustion requirement, when applicable, has been met. *See, e.g.*, *Paul G. v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1100 (9th Cir. 2019); *Payne*, 653 F.3d at 865; *Doucette*, 936 F.3d at 18–19.

Addressing the scope of the IDEA's exhaustion provision for the first time in *Fry*, the Supreme Court concluded that it applies only when a plaintiff is seeking "relief for the denial of a FAPE," 137 S. Ct. at 752—i.e., when a complaint challenges the adequacy of a child's educational program, *see id.* at 755 (noting that the IDEA concerns "schooling"); *id.* at 754 ("The IDEA's administrative procedures . . . center on the Act's FAPE requirement."). The Court recognized that "[a] school's conduct toward . . . a child [with a disability] . . . might injure her in ways unrelated to a FAPE," *id.* at 754, and it explained that a complaint seeking redress for such harms would not be subject to IDEA exhaustion "because . . . the only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE," *id.* at 754–55. As this court noted, presaging *Fry*, "§ 1415 makes it clear that Congress understood that parents and students affected by the IDEA would likely have issues with schools and school personnel that could be addressed—and perhaps could only be addressed—through a suit under § 1983 or other federal

laws." *Payne*, 653 F.3d at 872**[9]**; *see also McIntyre*, 976 F.3d at 915 ("Exhaustion should not be required merely because the plaintiff's complaint 'has some articulable connection to the education of a child with a disability' or else 'falls within the general "field" of educating disabled students.'" (quoting *Fry*, 137 S. Ct. at 752 n.3, 753)).

Determining whether IDEA exhaustion is necessary, then, requires distinguishing between "when a plaintiff 'seeks' relief for the denial of a FAPE and when she does not." *Fry*, 137 S. Ct. at 755. To discern the difference, *Fry* instructs courts to carefully examine the allegations in a complaint, and the inquiry must turn on "substance," not labels. *Id.* The presence or absence of "the precise words[] 'FAPE' or 'IEP'" will not be dispositive; rather, § 1415(*l*) "requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id.*; *see also*

---

**[9]** In its decision issued nearly six years before *Fry*, this court, sitting en banc, held in *Payne* that "[n]on-IDEA claims that do not seek relief available under the IDEA are not subject to the exhaustion requirement, even if they allege injuries that could conceivably have been redressed by the IDEA." 653 F.3d at 871. The court explained that it thus "overrule[d] our previous cases to the extent they state otherwise," and it "conclude[d] that . . . [the district court] should not have dismissed [the plaintiff's] non-IDEA claims on exhaustion grounds." *Id.* The en banc court remanded the case to the district court for application of "the new standards announced in this decision," and it directed the district court to "permit [the plaintiff] to amend her complaint in order to flesh out her specific claims and enable the court to determine which claims require IDEA exhaustion and which do not." *Id.* at 881. Here, by contrast, D.D. had the benefit of both *Payne* and *Fry* in crafting his complaint, and neither he nor the district court needs an opportunity to revisit the claims in light of new law. Hence, contrary to the dissent's assertion, our analysis is supported by, and consistent with, *Payne*. *See infra* Section II.C.

*McIntyre*, 976 F.3d at 913 (noting that "the inquiry does not turn on whether a complaint includes (or omits) any magic phrase, such as FAPE or IEP"). At the same time, however, courts must see beyond the school setting to determine if the plaintiff is claiming a violation of the equal access requirements of the ADA or § 504 rather than challenging the adequacy of special education services. *See, e.g.*, *McIntyre*, 976 F.3d at 916 (noting that a plaintiff is "not required to exhaust her claims under § 1415(*l*) merely because [the] events [at issue] occurred in an educational setting"); *Payne*, 653 F.3d at 875 (indicating that courts should not "treat[] § 1415(*l*) as a quasi-preemption provision, requiring administrative exhaustion for any case that falls within the general 'field' of educating disabled students").[10]

The Supreme Court recognized that, given the overlap among the statutes governing the education of children with disabilities, it may be difficult at times to distinguish between FAPE-based and non-FAPE-based claims. Indeed, the Court in *Fry* gave an example that highlights that challenge. A school building's lack of ramps to provide access for individuals who use wheelchairs could be the premise of a claim of unlawful discrimination under § 504 or the ADA—i.e., a claim unrelated to the quality of the education provided within the building. *See Fry*, 137 S. Ct. at 756. But a child who uses a wheelchair might also fashion an IDEA claim premised on the absence of a ramp at his

---

[10] As a reflection of the complexity of the relationship among the IDEA, the ADA, and § 504 of the Rehabilitation Act, the denial of a FAPE may itself serve as the basis for an ADA or § 504 claim—although such claims unquestionably would be subject to exhaustion under § 1415(*l*). *See Fry*, 137 S. Ct. at 754 (observing that a plaintiff who brings suit for the denial of an appropriate education under the ADA or § 504 would need to exhaust the IDEA's administrative procedures).

school because, "[a]fter all, if the child cannot get inside the school, he cannot receive instruction there." *Id.*[11]   In other words, the same remedy may be sought for two different purposes: one, to address a child's exclusion from school—his access to *any* education—and, two, to address that child's ability to benefit from instruction so that he may obtain an "appropriate" education.[12]

Hence, in determining the need for exhaustion, the question is not "whether the suit 'could have sought' relief available under the IDEA," but "whether a plaintiff's complaint—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education." *Id.* at 755.   The Court emphasized that "§ 1415(*l*) treats the plaintiff as 'the master of the claim': She identifies its remedial basis—and is subject to exhaustion or not based on that choice." *Id.* (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 & n.7 (1987)).  Accordingly, as some courts have put it, even when allegations based on the conduct of school officials "touch on the denial of a FAPE"—to be expected when claims arise in the school setting—the question remains whether the *gravamen* of the complaint concerns discrimination outside

---

[11] In *Fry* itself, the plaintiff alleged, *inter alia*, that school officials violated the ADA and § 504 by refusing to allow her trained service dog to accompany her in the classroom, thereby denying her equal access to the school and causing harm that included emotional distress and pain. *See* 137 S. Ct. at 751–52; *see also Doucette*, 936 F.3d at 20–21 (also involving a school's refusal to allow a child to bring a service dog into the classroom).

[12] The dissent goes astray in failing to acknowledge that D.D.'s asserted need for a one-to-one aide may properly be the basis for his claims under both the IDEA and the ADA.  As explained in Section II.C, the remedies sought here are not premised on the denial of a FAPE.

the IDEA's scope.  *Piotrowski ex rel. J.P. v. Rocky Point Union Free Sch. Dist.*, 462 F. Supp. 3d 270, 284 (E.D.N.Y. 2020); *see Lawton v. Success Acad. Charter Sch., Inc.*, 323 F. Supp. 3d 353, 362 (E.D.N.Y. 2018) (similar language); *see also J.S., III by and through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017) (per curiam) (noting that a student's claim of isolation "cannot [be] easily divorce[d]" from the school setting, but finding the claim distinct from an IDEA claim and not subject to exhaustion); *Payne*, 653 F.3d at 880 (noting that, even if the "unconstitutional beating" of a schoolchild would have consequences for his FAPE, "the resulting excessive force claim" would not necessarily require IDEA exhaustion).

Any exhaustion analysis must thus begin with a close examination of the plaintiff's complaint to determine whether its allegations "concern[] the denial of access to public facilities" or "the denial of a FAPE."  *Paul G.*, 933 F.3d at 1100.  Aware that the facts underlying each of those claims will at times overlap, the Supreme Court in *Fry* offered two clues that may assist a court's inquiry and indicate whether the gravamen of the complaint concerns the denial of a FAPE or disability-based discrimination.  *See Fry*, 137 S. Ct. at 756–57.

The first clue comes from the answers to "a pair of hypothetical questions," specifically, whether a child could bring the same claim outside the school context and whether an adult could "have pressed essentially the same grievance" within the school setting.  *Id.* at 756.  If the answer to both questions is "no," the claim probably concerns a FAPE; if the answer is "yes," the gravamen of the complaint is unlikely to implicate the IDEA's concern for "appropriate education."  *Id.*  The second clue is the history of the

plaintiff's pursuit of relief. *See id.* at 757. If a parent initially invokes the IDEA's administrative procedures, that "may suggest that she is indeed seeking relief for the denial of a FAPE." *Id.* But the Supreme Court also recognized that "the move to a courtroom [may have come] from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely." *Id.*

## C. Assessing the Complaint and the *Fry* Clues

The inquiry prescribed by *Fry* thus requires us to ascertain whether the district court correctly concluded that the gravamen of D.D.'s complaint "charges, and seeks relief for, the denial of a FAPE." *Id.* at 758. Put differently, we must answer this question: Is the "essence [of D.D.'s claim] equality of access to public facilities, [or] adequacy of special education"? *Id.* at 756. We begin our analysis with the complaint and then consider the *Fry* clues.

### 1. Examining the Complaint

D.D.'s amended complaint alleges only a violation of the ADA, but, as we have explained, the express labeling of his claim tells us little. However, importantly, the complaint summarizes his discrimination claim in language that reflects the broader access requirements of the ADA and the obligation to give individuals who have disabilities equal opportunity to participate in public programs. The complaint alleges that the District violated Title II "by failing to provide D.D. with . . . reasonable accommodations, auxiliary aids and services that he needed in order to enjoy *equal access to the benefits of a public education, and to otherwise not exclude D.D. from its educational program.*" A similar description of the claim appears in the complaint's Introduction, with its assertion that D.D. sought reasonable accommodations from the

District "so that he could have *equal access to his public education*, and the programs and services offered by [the District] to the same extent as his peers without disabilities."

The more specific factual allegations further indicate that the thrust of D.D.'s complaint is his loss of educational *opportunity* because he was banished from his classrooms, rather than deficiencies in his individualized educational program.   The complaint's Introduction notes that the District addressed D.D.'s "educational needs" by offering occupational, language, and speech therapy, "but [it] never addressed D.D.'s significant behavior needs" that repeatedly resulted in his exclusion from school.  Instead, the complaint alleges, the "District discriminated against D.D. on the basis of his disability by removing him from his classroom; sending him home early on multiple occasions, and requiring a parent to attend school with D.D. to serve as his one-to-one aide instead of providing one."   D.D. alleges that "[t]his pattern of discrimination" occurred at each of his elementary schools and that he was "subjected to taunting by District staff" and "received injuries caused by other students and a . . . staff member" at one of the schools.  The complaint goes on to detail the circumstances D.D. faced in each of the three academic years at issue: 2015–16, 2016–17, and 2017–18.

For the first two years, the complaint alleges, the District's schools "exclud[ed] him from participation in all school activities" by regularly demanding that his mother pick him up early—sometimes shortly after the school day began.  Early in both academic years, the schools declined to provide a one-to-one aide to "enable [D.D.] to participate with his peers," and instead issued the ultimatum that the family either provide an aide or remove D.D. from school. For the next school year, 2017–18, the complaint states that D.D. was able "to access his education to the same extent as

students without disabilities" only because of Albert's presence, and it recounts the incident in which D.D. claimed he was pushed down the stairs, followed by the taunting and threats from school staff members. The complaint reports another request by D.D.'s mother, rejected by the District, for "reasonable accommodations for her son's disability-related behavior, including a one-to-one aide or [non-public school] placement to enable D.D. to have equal access [to] his education to the same extent as his peers without disabilities."

After describing the additional difficulties D.D. faced during the 2017–18 school year—including being left to walk around school grounds "for almost the entire school day unattended," and being bullied on the bus to and from school—the complaint summed up his treatment as follows:

> Rather than offering meaningful and appropriate behavior accommodations and allowing D.D. to attend school for the same amount of time as typical peers, [the] District discriminated against D.D. on the basis of his disability by excluding him from school, refusing to offer an aide, only allowing him to stay in school if his Parent served as an aide, and by enabling him to be subjected to an unsafe school environment.

As a result of this discrimination, the complaint alleges, "D.D. suffered injury, including, but not limited to, denial of equal access to the benefits of a public education," "as well as humiliation, hardship, anxiety, depression and loss of self-esteem."

Notably absent from the complaint are references to the allegedly inadequate educational programs and IEP-related

services that were addressed in the Request for Mediation and Due Process Hearing—i.e., the asserted failures to provide D.D. with a suitable IEP and, concomitantly, the failure to provide him with the FAPE mandated by the IDEA. *See supra* Section I.[13]  Stated simply, the complaint repeatedly highlights D.D.'s *exclusion* from the classroom, not the inadequacy of his experience *in* the classroom.  It further alleges multiple instances of verbal and physical abuse in school and on the school bus, conduct unrelated to D.D.'s education.

The complaint thus manifestly supports a conclusion that D.D.'s lawsuit does not implicate the educational program of the IEP and, hence, that his ADA discrimination claim does not require exhaustion pursuant to § 1415(*l*).  We nonetheless consider the *Fry* clues to see if they shed a different light on our inquiry.

### 2.  The *Fry* Clues

The hypothetical questions posed by *Fry* as the first possible clue in ascertaining the gravamen of a school-based disability-discrimination complaint—whether the plaintiff could bring the same claim outside the school setting and whether an adult or school visitor could bring the same claim

---

[13] The only reference to D.D.'s *educational* needs appears by way of background in the Introduction, which explains that, "[p]ursuant to the ADA, he is considered to have a disability that interferes with his ability to learn," and that "his educational needs have been explicit and include support for ADHD, communication and fine motor skills."  As described above, the complaint goes on to state that the District offered services "to address those needs," but did not address his "significant behavior needs" and instead "discriminated against D.D. on the basis of his disability" by excluding him from school unless one parent accompanied him.

within the school setting—have less obvious answers here than for the wheelchair ramp (the Supreme Court's first example to illustrate how the clue works) or for the service dog at issue in *Fry*. A child's need for a ramp or a service dog for equal access to a public program or service plainly could exist in contexts beyond education and a school building—for example, at a municipal library or theater, as the Supreme Court posited in *Fry*. *See* 137 S. Ct. at 756. Similarly, it is apparent that a school employee or an adult visitor to a public school could present the same claim as a student that the lack of a ramp or refusal to allow a service dog violates the ADA. *See id.*

It is more difficult to picture a child claiming that a public library or municipal theater should have provided him with the accommodation D.D.'s mother repeatedly requested of the District—a one-to-one behavioral aide—so the child could participate in the library's story time or attend a theatrical performance. A school visitor asking the District to provide a personal aide seems even more incongruous. To use the Court's access-ramp example in such a limited way, however, mistakes the point of the comparison the Court was suggesting. The hypothetical questions are not meant to shed light on whether the plaintiff was entitled to the specific accommodation he claims he was unlawfully denied—a ramp, a service dog, or a one-to-one aide—but, rather, to serve as a tool in determining whether the "essence [of his claim] is equality of access to public facilities [or] adequacy of special education." *Id.* That is, the question in the exhaustion inquiry involving an ADA claim is the nature of the harm of which the child complains: is it access-based or education-based? The specific remedy requested may be a useful clue in answering that question, but *Fry* also contemplates that it may not be. *See id.* at 756–57 (noting

that the hypothetical questions "can" provide a clue to the complaint's gravamen or "suggest" its essence).

Hence, we must not be misled in assessing the allegations in this case by the comparative ease of transplanting the lack of a ramp and the refusal to allow a service dog to non-school contexts. D.D.'s complaint similarly seeks a remedy for harms stemming from his exclusion from a public program—specifically, a public education. His disability-caused behavioral issues repeatedly resulted in his removal from school or his classroom, and D.D.'s mother identified a personal aide as one accommodation she believed reasonable and necessary for her son to obtain the same access to an education as his peers. In other words, she claims that a one-to-one aide would have assisted her son in managing his disruptive behaviors, enabling him to remain in school and in his classroom so that he had the *opportunity* to learn—akin to the access provided by the ramp and the service dog in the *Fry* scenarios.[14] The key similarity, however, is not between the ramp and the dog and the personal aide. It is the equivalent allegations of *exclusion* stemming from the school's failure to provide some accommodation to ensure equality of access to a public education.

---

[14] To be clear, D.D.'s lawsuit does not seek as a remedy a one-to-one aide or any other prospective accommodation. He requests only damages for injuries allegedly caused by the District's past failure to provide him with reasonable accommodations in violation of the ADA. Although the allegations in the complaint suggest that the District recognized that D.D. needed a one-to-one aide to access his education— i.e., by demanding that his parents provide one—the merits question of whether the District's failure to provide such an aide violated the ADA is not before us in this appeal.

Indeed, the Court in *Fry* observed that the context of a disability discrimination lawsuit—for example, whether the defendant is a school or a theater—may be pertinent in assessing the reasonableness of challenged conduct. *Id.* at 756 n.9. Our inquiry, therefore, does not turn on whether D.D. could bring the identical action against a different type of public facility; rather, "the plausibility of bringing *other variants* of the suit" can "indicate[] that the gravamen of the plaintiff's complaint does not concern the appropriateness of an educational program." *Id.* (emphasis added). We have no difficulty concluding that D.D. could bring a "variant of [his] suit" if he were refused entry to a public library or a municipal theater based on the behavioral symptoms of his disability. *See, e.g.*, *Lawton*, 323 F. Supp. 3d at 362 (noting that "disabled children [with behavioral issues] would have a claim against a public library" where, inter alia, the library "used strict disciplinary rules to remove them on a daily basis"). Likewise, "even an adult plaintiff may be entitled to receive assistance from others [within a school context] if such an accommodation is 'reasonable.'" *McIntyre*, 976 F.3d at 916.

Moreover, the second example in *Fry*, which the Court offered as a counterpoint to the access-ramp example, unmistakably indicates that the "*substance*" of D.D.'s claim is not the denial of an appropriate education. *Fry*, 137 S. Ct. at 757 n.10. In this latter example, the Court described an ADA suit alleging a failure to provide remedial tutoring in mathematics in which the plaintiff made "no reference at all to a FAPE or an IEP." *Id.* at 757. Yet, the Court asked, "[C]an anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial?" *Id.* The Court observed that the difficulty of visualizing the complaint in "those other contexts suggests

that its essence—even though not its wording—is the provision of a FAPE." *Id.*

As noted above, D.D.'s complaint contains no allegations asserting that the District provided inadequate programs or services to address deficiencies in his academic progress or performance. Nor does he seek a remedy premised on his failure to reach the goals set forth in his IEP. And, as we have explained, the mere fact that certain conduct that allegedly violated the ADA—the refusal to provide a one-to-one aide—also could be challenged under the IDEA does not mean that D.D.'s access-based claim is a FAPE claim in disguise. To be sure, a personal aide who helps a child control his behavior, allowing the child to remain within a school building or classroom, could also be a necessary component of a FAPE, enabling the child to benefit from any instruction provided to him. But the plaintiff, as "the 'master of the claim,'" *id.* at 755 (quoting *Caterpillar Inc.*, 482 U.S. at 392 & n.7), may, without exhaustion, seek damages in court under the ADA based on conduct that also could be challenged for a different reason under the IDEA. *See id.* at 756 ("The same conduct might violate all three statutes[.]"); *see also Doucette*, 936 F.3d at 27 ("A child who requires an accommodation under an IEP because, without it, his education would be inadequate, might also require that accommodation to safely access a public space."); *Payne*, 653 F.3d at 880 (noting that, even when certain conduct "might interfere with a student enjoying the fruits of a FAPE, the resulting . . . claim is not, for that reason alone, a claim that must be brought under the IDEA").

Because the factual allegations in D.D.'s complaint address his exclusion from the classroom and the entire school program, and not his learning needs as set forth in his

IEP, his claim is a far cry from one involving "remedial tutoring in mathematics." *Fry,* 137 S. Ct. at 757; *see also id.* at 758 ("The complaint . . . does not accuse the school even in general terms of refusing to provide the educational instruction and services that [the plaintiff] needs."). Thus, particularly when taken together, the two examples used by the Supreme Court (the access ramp and math tutoring) to illustrate the possible usefulness of its first clue on the exhaustion question reinforce our conclusion, based on the complaint's allegations, that D.D.'s civil action presents an independent ADA claim and is not—contrary to the District's contention—an artfully pled FAPE-based claim.

However, the possibility remains that the second *Fry* clue—the history of the proceedings—"might suggest something different." *Id.* at 758. Indeed, D.D.'s administrative Request sought remedies for the same harms alleged in his complaint (and more), including a request for damages based on a violation of the ADA. *See supra* Section I. In *Fry*, the Supreme Court observed that "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Id.* at 757.

Nonetheless, as this court previously has emphasized, the IDEA's exhaustion requirement "is not intended to temporarily shield school officials from all liability for conduct that violates constitutional and statutory rights that exist *independent* of the IDEA and entitles a plaintiff to relief *different* from what is available under the IDEA." *Payne*, 653 F.3d at 876. Here, the use of litigation, and the repetition in D.D.'s complaint of allegations and relief initially requested in the administrative proceedings, cannot be attributed to "strategic calculations about how to maximize

the prospects" of obtaining remedies for violations of the IDEA that D.D. failed to exhaust through the administrative process. *Fry*, 137 S. Ct. at 757. That is so for two reasons.

First, as we have repeatedly noted, D.D. is entitled to invoke the same requested accommodation for different purposes under the IDEA and the ADA. As described above, the allegations in the complaint and the *Fry* clues unequivocally demonstrate a non-FAPE basis for the damages D.D. seeks pursuant to the ADA. The fact that he also sought a one-to-one aide as a component of his IEP does not derail that independent claim. Moreover, D.D.'s settlement agreement with the District expressly preserved "any claims that can be made under" the ADA.

Second, the comprehensiveness of the administrative Request, expressly invoking the statutes that provide relief for disability discrimination, belies any inference that D.D. attempted to change strategies midstream. Rather, it appears that D.D. was simply giving the District notice of all anticipated bases for relief for his complaints of mistreatment—whether available through the IDEA administrative process or not. That is, D.D.'s mother, on her son's behalf, did not initially present solely an IDEA claim in the administrative proceedings and then "switch[] midstream" to litigation pursuant to the ADA. *Id.* She transparently set forth all of his claims and, after resolving the issues concerning D.D.'s right to a FAPE, turned to the anticipated litigation under the ADA in pursuit of a remedy—one that is not "also available under [the IDEA]," 20 U.S.C. § 1415(*l*)—for the harms unrelated to his educational services.

There is nothing untoward—or inconsistent with *Fry*— in D.D.'s having followed resolution of his IDEA claims with a lawsuit alleging non-FAPE-based violations of

another statute. In recognizing that a school's conduct toward a child with a disability "might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA," 137 S. Ct. at 754, *Fry* contemplates such a strategy. *See id.*; *see also, e.g.*, *Payne*, 653 F.3d at 879 ("It is hardly a[] nullification of the congressionally mandated exhaustion requirement to say that a complaint that presents sound claims wholly apart from the IDEA need not comport with the IDEA's requirements." (citation omitted) (internal quotation marks omitted)); *Doucette*, 936 F.3d at 26–28 (noting that parents' invocation of multiple laws to obtain relief for their son is "not surprising" given that a student may need the same accommodation under an IEP and for safe access to a public space). To conclude otherwise would effectively bar plaintiffs from bringing a school-based disability-discrimination lawsuit simply because they also have pursued relief under the IDEA—a view emphatically rejected by this circuit, *see Payne*, 653 F.3d at 876, and inescapably at odds with *Fry*.

Of course, as explained above, *see supra* note 10, a lawsuit that claims an ADA violation *based on* an IDEA violation cannot be brought without first exhausting the IDEA's administrative procedures. *See Fry*, 137 S. Ct. at 754 (noting that, if "a lawsuit seeks relief for the denial of a free appropriate public education[,] . . . the plaintiff cannot escape § 1415(*l*) merely by bringing her suit under a statute other than the IDEA"). This court properly dismissed such a lawsuit for lack of exhaustion in *Paul G. v. Monterey Peninsula Unified School District,* where the parents of an autistic child sought damages for the district's failure to provide the child a school placement they claimed was necessary for him to receive a FAPE. *See* 933 F.3d at 1098; *see also Payne*, 653 F.3d at 875 (recognizing the need to exhaust FAPE-based claims); *S.B. by and through Kristina*

*B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1247 (E.D. Cal. 2018) (finding that exhaustion was required where "[p]laintiffs' [Rehabilitation Act] and ADA claims appear predicated on the denial of [a] FAPE"). Here, however, as our assessment of the complaint's allegations and the *Fry* clues makes clear, we have a claim seeking to enforce the ADA's "promise [of] non-discriminatory access to public institutions" rather than the IDEA's "guarantee[ of] individually tailored educational services." *Fry*, 137 S. Ct. at 756; *cf. Paul G.*, 933 F.3d at 1101 (observing that the relief sought was "fundamentally educational": "access to a particular kind of school as required by his IEP").[15]

In sum, because D.D. has alleged a cognizable claim under the ADA, "irrespective of the IDEA's FAPE obligation," *Fry*, 137 S. Ct. at 756, the district court erred in dismissing his complaint. *See, e.g.*, *J.S., III by and through J.S. Jr.*, 877 F.3d at 986 (concluding that a plaintiff's claim of discriminatory exclusion from his regular classroom "could be brought as a FAPE violation for failure to follow [his] IEP, . . . [but] it is also cognizable as a separate claim for intentional discrimination under the ADA and § 504").[16]

---

[15] We note that the Supreme Court in *Fry* expressly declined to decide whether exhaustion is required when a plaintiff seeks solely money damages for emotional distress resulting from the denial of a FAPE—a remedy unavailable under the IDEA. *See* 137 S. Ct. at 752 n.4; *id.* at 754 n.8. This court has indicated that such a claim must be exhausted. *See Payne*, 653 F.3d at 875 (observing that "exhaustion is required in cases where a plaintiff is seeking to enforce rights that arise as a result of a denial of a [FAPE], whether pled as an IDEA claim or any other claim that relies on the denial of a FAPE to provide the basis for the cause of action").

[16] In criticizing the majority's application of Ninth Circuit precedents, our dissenting colleague overlooks this distinction between a student's pursuit of an appropriate education and claims of

We therefore **VACATE** the dismissal of the complaint and **REMAND** the case to the district court for further proceedings consistent with this opinion.

*So ordered.  The parties shall bear their own costs on appeal.*

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent.  I agree with the majority that the Supreme Court decision in *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017), informs our analysis.  However, I part company with the majority's application of *Fry* to the facts of this case.

As the majority set forth, the Supreme Court has instructed courts to carefully examine the allegations in the complaint to distinguish between "when a plaintiff seeks relief for the denial of a [Free Appropriate Education] (administrative exhaustion required) and when she does not (administrative exhaustion not required)."  *Id.* at 755

---

discriminatory treatment in the school context.  In *Paul G.* and *S.B. by and through Kristina B.*, the students were seeking specific instructional environments through their ADA and § 504 claims and, hence, administrative exhaustion was required.  *See Paul G.*, 933 F.3d at 1101 (addressing plaintiff's claim for "access to a particular kind of school"); *S.B. by and through Kristina B.*, 327 F. Supp. 3d at 1252–53 (similarly addressing claims concerning the plaintiff's educational placement).  In *McIntyre*, the panel concluded that exhaustion was *not* required because the student's claims focused on her discriminatory mistreatment and not her educational program.  *See* 976 F.3d at 914.  As in *McIntyre*, "the 'crux' of [D.D.]'s complaint seeks relief for the denial of equal access to a public institution," not relief for the denial of appropriate individualized instruction.  *Id.* at 916.

(internal quotation marks omitted) (parentheticals added). Our focus is on the "remedial basis" of the complaint and the plaintiff "is subject to exhaustion or not based on that choice." *Id.* (citation omitted).

The Supreme Court offered two hypothetical questions to aid in making the requisite distinction between a request for a Free Appropriate Public Education [FAPE] and a request for non-FAPE relief.

The first hypothetical question asks whether the plaintiff could "have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school," such as a public theater or library. *Id.* at 756 (emphasis in the original). The second question inquires whether "an *adult* at the school," such as an employee of the school or visitor to the school, could "have pressed essentially the same grievance." *Id.* (emphasis in the original). If the answer to the questions is yes, "a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject." *Id.* On the other hand, if the answer to the questions is no, "the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." *Id.*

The Supreme Court then offered two contrasting examples. The first example described a wheelchair-bound child who brought an action against his school for discrimination due to the lack of access ramps. The Supreme Court initially recognized that the missing "architectural feature" could have educational consequences and might have been couched as a violation under the Individuals with Disabilities Education Act (IDEA). After all, the Supreme Court posited, "if the child cannot get inside the school, he

cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic (or later to real-world) success." *Id.* But because this child could bring the same complaint against a library or other public building and an employee or visitor could bring "a mostly identical complaint against the school," the Supreme Court concluded that the "essence" of the complaint in those circumstances is "equality of access to public facilities, not adequacy of special education." *Id.* (citation omitted).

By way of comparison, the Supreme Court described a student with a learning disability who sued his school for failing to provide remedial tutoring in math. The Supreme Court observed that the action "might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation." *Id.* at 757. Even if the complaint made no reference to a FAPE, the Supreme Court asked: "[C]an anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial?" *Id.* According to the Supreme Court, "[t]he difficulty of transplanting the complaint to those other contexts suggests that its essence— even though not its wording—is the provision of a FAPE." *Id.* (footnote reference omitted).

The Supreme Court also noted that "[a] further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings." *Id.* The Court referenced "in particular" whether "a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute." *Id.* Indeed, "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial

of a FAPE, even if the complaint never explicitly uses that term." *Id.* (footnote reference omitted).

In my view, application of the analysis set forth in *Fry* militates toward a conclusion that D.D. sought FAPE relief. For starters, there is the "strong evidence" that D.D. previously pursued relief under the administrative procedures set forth in the IDEA.

At this juncture, it would be helpful to examine the issues raised and remedies sought in D.D.'s complaint brought under the IDEA's administrative procedures. D.D. raised the following issues:

> 1. [School] District failed to provide student appropriate placement and services to address his behavioral needs, thereby *denying student a FAPE* . . . (D.D.'s primary request under this issue was for "a more appropriate placement . . . and/or a one-to-one behavioral aide.")

> 2. [School] District failed to offer sufficient services and supports in the area of occupational therapy, thereby *denying student a FAPE* . . .

> 3. [School] District failed to offer sufficient services and supports in the area of speech and language, thereby *denying student a FAPE* . . .

> 4. [School] District failed to offer sufficient services and supports in the area of psychological counseling, thereby *denying student a FAPE* . . .

5.  [School] District failed to offer sufficient services and supports in the area of social skills, thereby *denying student a FAPE* . . .

6.  Parent disagrees with [School] District's . . . Functional Behavior Assessment and requests an independent Functional Behavior Assessment at public expense. . . . (Referencing the IDEA).

7.  Parent disagrees with [School] District's . . . Psychoeducational Evaluation and requests an independent Psychoeducational Evaluation at public expense. . . . (Referencing the IDEA).

8.  Parent disagrees with [School] District's . . . Speech and Language Assessment and requests an independent Speech and Language Assessment at public expense. . . . (Referencing the IDEA).

9.  [School] District failed to re-evaluate student in the area of occupational therapy . . . , thereby *denying student a FAPE*.

10. [School] District *failed to offer student a FAPE* at all times relevant in violation of Section 504 of the Rehabilitation Act.

11. [School] District *failed to offer student a FAPE* at all times relevant in violation of Section 504 of the Rehabilitation Act.

      12. [School] District violated Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (Asserting that student was denied access to his education).

      13. [School] District violated the [California] Unruh Civil Rights Act.

D.D. sought the following remedies from the School District:

      1.  The following services to be provided to D.D. "as an offer of FAPE":

- A full-time, one-on-one aide

- Twelve hours of behavior intervention development

- Revision of D.D.'s behavioral support plan

- Increased speech and language services

- A social skills program

- Increased occupational therapy

- A sensory diet in D.D.'s classroom

- Increased psychological counseling services

2. Direct funding or reimbursement for the following independent evaluations:

- Psychoeducational evaluation

- Speech and Language assessment

- Occupational Therapy assessment

- Functional Behavior assessment

3. School District to provide student with the following compensatory education services:

- 400 hours of compensatory specialized academic instruction services

- 80 hours of compensatory occupational therapy services

- 80 hours of compensatory speech and language therapy services

- 72 hours of compensatory individual psychological counseling services

- 80 hours of a social skills program

D.D. also sought damages under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act (ADA), and the Unruh Civil Rights Act. However, no allegations other than the IDEA-based claims were asserted in conjunction with these requested remedies. As noted in *Fry*, this "prior pursuit of the IDEA's administrative

remedies" constitutes "strong evidence that the substance of [D.D.'s] claim concerns the denial of a FAPE," particularly as it was coupled with a request for relief under the ADA and under § 504 of the Rehabilitation Act.  137 S. Ct. at 757.

Despite a concerted effort to reframe D.D.'s complaint to state a claim for disability discrimination rather than a claim for a FAPE, the allegations of the First Amended Complaint are remarkably similar to those in the complaint brought pursuant to the IDEA.

In both complaints, the recurring theme was that the School District's failure to provide D.D. a one-to-one aide resulted in D.D.'s inability to access the programs and activities at his school.   A chart comparing the two demonstrates this point.

| IDEA Complaint | First Amended Complaint |
|---|---|
| "During the 2015–201[6] and 2016–17 school years, District failed to provide [D.D.] a one-to-one behavior aide . . ." | "D.D. requested reasonable accommodations from District, including a one-to-one behavior aide, so that he could have equal access to his public education . . ." |

| | |
|---|---|
| "Throughout that time, parents were called constantly to either take [D.D.] home or to come sit with him at school and serve as a one-to-one aide. One of [D.D.'s] parents quit his job, simply to sit with [D.D.] at school . . . because he needed someone with him to manage his behaviors and enable him to remain at school and participate in the classroom." | "In the 2016–2017 school year, . . . Parent asked [D.D.'s teacher] about a one-to-one aide for [D.D.], but [the teacher] did not make a referral for an aide or functional behavior assessment.<br><br>"[I]n October, 2016 [the parents] made the decision that [the father] would quit his job to serve as D.D.'s one-to-one aide." |
| "In the 2015–2016 school year, . . . [at] no point during the year, did District offer a one-to-one behavior-trained aide to work with [D.D.] to enable him [to] remain in class and work effectively." | "D.D.'s mother requested a one-to-one aide . . . to accommodate D.D.'s needs and enable him to participate with his peers, but school staff told her it was impossible. . . . School staff presented Parent an ultimatum: either pick him up from school or have a family member serve as his one-to-one aide to enable D.D. to participate in the classroom. . . ." |

Although the amended complaint now asserts disability discrimination, as reflected above the gravamen of the complaint remains the failure of the school district to assign a one-to-one behavior aide and other supportive services to manage D.D.'s behavior.

As the Supreme Court advised in *Fry*, we look beyond the labels in the pleadings and examine the substance of the complaint. In this case, the substance of D.D.'s federal complaint is the same as the substance of his IDEA complaint—failure of the School District to ensure the necessary support to provide D.D. a FAPE, thereby triggering the administrative exhaustion requirement. *See id.* Indeed, even the mentions a one-to-one aide at least six times.

Comparison of D.D.'s complaints to the hypothetical questions in *Fry* reinforces the conclusion that the "essence [of the complaint]—even though not its wording—is the provision of a FAPE. *Id.* (footnote reference omitted).

The first hypothetical question asks whether D.D. could have brought "essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school," such as a public theater or library. *Id.* at 756 (emphasis in the original). The answer to this question is no. D.D. could not have brought a claim against a public theater or library on the basis of the denial of a one-to-one behavioral aide or the provision of behavioral analysis services. For that matter, it is doubtful that D.D. could even bring an action against a private entity for the repurposed claim of barring him from the premises due to his violent outbursts. Those claims are viable against the School District solely because of the School District's obligation to provide a FAPE. *See id.*

The second hypothetical question asks whether "an *adult* at the school," such as an employee or visitor could "have pressed essentially the same grievance." *Id.* (emphasis in the original). Again, in this case the answer to the question is no. It is inconceivable that an adult at the school could have pressed a claim for a one-to-one behavioral aide or behavioral assessments and evaluations to fully participate in school activities. As explained by the Supreme Court, because the answer to the *Fry* hypothetical questions is no, even though the amended complaint "does not expressly allege the denial of a FAPE," *id.*, the complaint concerns a FAPE because "the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." *Id.*

The same outcome results from application of the examples discussed in *Fry.* The first example, a wheelchair-bound student who brought a discrimination action against his school due to the lack of wheelchair ramps is clearly a claim that could be brought by the child in a public setting outside of school; the claim is more likely under the Rehabilitation Act than the IDEA. *See Fry*, 137 S. Ct. at 756.; *see also Alvarez-Vega on behalf of E.A.L. v. Cushman & Wakefield/Prop. Concepts Com.*, 290 F. Supp. 3d 131, 132–34 (D.P.R. 2017) (describing action brought under the ADA on behalf of a child seeking equal access to theater facilities). By the same token, an adult employee of the school or visitor to the school could bring "a mostly identical complaint against the school" for lack of wheelchair access, Fry, 137 S. Ct. at 756; the "essence" of the complaint is "equality of access to public facilities, not adequacy of special education. *Id.* (citation omitted); *see also Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 984–86 (9th Cir. 2014) (discussing an ADA action seeking wheelchair access to bleachers in a football stadium).

The comparator example in *Fry* involved a student with a learning disability who sued his school for failing to provide remedial tutoring in math. Although the action "might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation," *id.* at 757, the more accurate description of the action is for failure to provide a FAPE. The Supreme Court explained that even if there is no explicit reference to FAPE in the complaint, "can anyone imagine the student making the same claim against a public theater or library? Or similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? *Id.* As recognized by the Supreme Court, "[t]he difficulty of transplanting the complaint to those other contexts [student in a non-school setting or adult in school setting] suggests that its essence—even though not its wording—is the provision of a FAPE." *Id.* (footnote reference omitted).

The facts of this case fit much more cleanly into the second example. The requests made by D.D. are more akin to a request for a tutor than a request for wheelchair access. Applying the *Fry* analysis, the conclusion is inescapable that despite the concerted effort to avoid use of FAPE verbiage, the essence of D.D.'s complaint seeks FAPE relief, thereby requiring administrative exhaustion. *See id.*

I am not persuaded by the cases relied upon by the majority to reach a different outcome. Rather, a majority of the cases cited by the majority concluded that exhaustion was required.

The majority cites *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863 (9th Cir. 2011) (en banc), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc). However, in *Payne*, the en banc court did not actually make a determination regarding whether

exhaustion was required under the facts of the case. Rather, the case was remanded for the district court to "examine each of Payne's requests for relief and determine whether the exhaustion requirement applies to each." *Id.* at 882. The holding in *Payne* is inapposite here because, as discussed above, we know the relief requested by D.D. in the administrative proceedings and in the amended complaint. That requested relief was available under the IDEA, thereby requiring exhaustion. *See id.* In addition, *Payne* does not support the majority's statement that "[t]here is nothing untoward - - or inconsistent with *Fry* - - in D.D.'s having followed resolution of his IDEA claims with a lawsuit alleging non-FAPE-based violations of another statute." *Majority Opinion*, p. 31. Importantly, D.D.'s claim differs from *Payne* in that D.D. first brought his claims in a due process hearing asserting violations of the IDEA. *Cf. Payne*, 653 F.3d at 865 (noting that "Payne did not initially seek relief in a due process hearing"). In *Fry*, the Supreme Court advised that a plaintiff who "has previously invoked the IDEA's formal procedures to handle the dispute" is more likely "seeking relief for the denial of a FAPE." 137 S. Ct. at 757. The Supreme Court elaborated that "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." (footnote reference omitted). In sum, *Payne* does not really support the majority's reasoning.

*Doucette v. Georgetown Public Schools*, 936 F.3d 16 (1st Cir. 2019), a non-binding case from the First Circuit, is also cited by the majority. Nevertheless, *Doucette* offers little support for the majority's analysis. Most importantly, the case involved the denial of a service animal—the quintessential example of a non-IDEA accommodation. *See, e.g. Antoninetti v. Chipotle Mexican Grill*, 643 F.3d 1165,

1168 (9th Cir. 2010), *as amended* (involving the assertion of claims against a restaurant under the ADA for failure to adequately accommodate a "wheelchair-bound customer"); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1037–38 (9th Cir. 2008) (resolving a case brought against a convenience store for inadequate wheelchair access); *Long v. Coast Resorts, Inc.*, 267 F.3d 918, 920 (9th Cir. 2001) (same for hotel casino); *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008) (interpreting the ADA as requiring a racetrack to provide wheelchair areas with line-of-sight over standing spectators); *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1127–28 (9th Cir. 2003) (reversing entry of summary judgment in favor of a theater on a claim that placing all "wheelchair-bound patrons" in the first few rows violated the ADA).

The next out-of-circuit case relied upon by the majority is a case from the Eleventh Circuit, *J.S., III, a minor, by and through J.S. Jr. and M.S.*, 877 F.3d 979 (11th Cir. 2017). However, *J.S.* is of little assistance because it completely failed to grapple with the analysis suggested in *Fry*. The sum total of the application of *Fry* to the facts was the following sentence: "The cause of action here does not fit neatly into *Fry*'s hypotheticals." *Id.* at 986. Enough said.

The third out-of-circuit case cited by the majority is a district court case from the Eastern District of New York, *Lawton v. Success Academy Charter Schools, Inc.*, 323 F. Supp. 3d 353 (E.D.N.Y. 2018), which relied on the Eleventh Circuit's decision in *J.S.* As explained, reliance on *J.S.* is unwarranted.

The two cases from within the Ninth Circuit cited by the majority do not support the majority's conclusion. In *Paul G. by and through Steve G. v. Monterey Peninsula Unified School Dist.*, 933 F.3d 1096 (9th Cir. 2019), we considered

a case in a similar procedural posture to the case before us. Paul G. filed an action under the ADA and under Section 504 of the Rehabilitation Act of 1973 (Section 504). *See id.* at 1098. We affirmed the district court's dismissal of the complaint for failure to exhaust administrative remedies under the IDEA. *See id.* We explained that "Plaintiffs failed to exhaust because they settled their IDEA case without receiving an administrative decision on whether Paul needed the placement." *Id.* We referenced the Supreme Court's instruction in *Fry* that we "determine whether the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee—a free appropriate public education [FAPE]. *Id.* at 1100 (quoting *Fry*, 137 S. Ct. at 748) (alteration and internal quotation marks omitted).

We identified the "crucial issue" as "whether the relief sought would be available under the IDEA." *Id.* We referenced the "clues" provided in *Fry* including "whether the plaintiff could have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school, and whether an adult at the school could have expressed essentially the same grievance." *Id.* (quoting *Fry*, 137 S. Ct. at 756) (alteration and internal quotation marks omitted).

Just as D.D. could not have brought his claims for a one-on-one aide to prevent his disruptive behavior against a public facility that was not a school, we came to the same conclusion regarding Paul's demand for a particular school placement. *See id.* at 1101. Similarly, we concluded that an adult employee or visitor could not "present the same grievance." *Id.* We concluded that, at bottom, "the relief Paul seeks is fundamentally educational." *Id.* The same is true for D.D. As we recognized in *Paul*, and as articulated in *Fry*, "one good indication that the plaintiff is seeking

relief for denial of a FAPE is whether the plaintiff previously invoked administrative remedies." *Id.* at 1100 (citing *Fry*, 137 S. Ct. at 757). We confirmed that "an initial decision to pursue the administrative process and a later shift to judicial proceedings prior to full exhaustion is a strong indication that the plaintiff is making strategic calculations about how to maximize the prospects of such a remedy." *Id.* at 1101 (quoting *Fry*, 137 S. Ct. at 757) (internal quotation marks omitted). As with this case, "Paul['s] previous[] pursu[it of] an IDEA administrative proceeding based on identical or similar allegations supports the [district court's] conclusion that his claims are premised on the denial of a FAPE." *Id.*

As is the case here, we observed in *Paul G.* that "Paul pursued remedies under [the] IDEA and after settlement switched gears to turn to other remedies." *Id.* We identified this circumstance as "almost precisely the scenario the Supreme Court in *Fry* described as an indicator of an IDEA claim requiring exhaustion." *Id.*

The reasoning and conclusion in *Paul G.* are completely contrary to the reasoning and conclusion in the majority opinion`. The same is true for *S.B. by and through Kristina B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218 (E.D. Calif. 2018). The district court relied on *Fry* to conclude that S.B.'s claims brought pursuant to the ADA and pursuant to Section 504 required exhaustion. *See id.* at 1252. S.B. asserted that the State acted in a discriminatory manner "by failing to ensure that appropriate residential treatment centers were available in the State of California." *Id.* The district court noted that S.B. was "unable to frame a theory of the[] [Section 504] and ADA claims that could be brought against any public place of accommodation, not just a school, and by any person with a similar disability, not only a student, as explained in *Fry*." *Id.* at 1253. The district

court also observed that the fact that S.B. "pursued administrative proceedings based on identical or similar allegations supports a conclusion that the claims are premised on a denial of FAPE." *Id.* (citing *Fry*, 137 S. Ct. at 755).

Finally, our most recent decision addressing this issue is consistent with the analysis in *Paul G.* and *S.B.* In *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 907 (9th Cir. 2020), we delineated circumstances under which administrative exhaustion was not required.

The student in *McIntyre* was diagnosed with attention deficit disorder (ADD) as a preteen. During her seventh-grade year, the school district developed a "504" plan (504 Plan) for the student, but she never sought or was provided an IEP under the IDEA. *See id.* at *907 and n.4.

The student's 504 Plan provided accommodations for her diagnosed ADD, "including extra time on tests and assignments, reduced assignments and projects, preferred seating, and a quiet and separate testing environment." *Id.* (footnote reference omitted). Unfortunately, one of her teachers refused to implement her 504 Plan. As a result, the student's parents filed a "Bullying/ Harassment" complaint against the teacher. *Id.*

The student studied abroad her sophomore year. At the beginning of her junior year, the student was diagnosed with Addison's disease, a serious autoimmune disorder. *See id.* at 908 and n.5. As a result, the school district amended the student's 504 Plan "to include an emergency protocol that required school officials to call 911 if she were seriously injured" at school. *Id.* at 908. Despite the student suffering a fractured ankle during a physical education class, school

officials failed to call 911 as required in the student's 504 Plan.  *See id.*

In the spring of the student's junior year, the school district reassigned one of the teachers who had refused to implement the student's 504 Plan.  The student's classmates organized a walk-out to protest the reassignment and the accommodations for students with disabilities.  They blamed the "504 kids" for the transfer.  *Id.*  The social studies teacher gave permission for students to walk out of her class in protest.  The student felt betrayed by the teacher and school administrators who sat idly by.  She also felt isolated from her classmates.  *See id.*

Throughout the balance of the student's junior year and the entirety of her senior year, her classmates "maintained their resentment, harassing and bullying [the student] for her perceived role in [the teacher's] transfer."  *Id.*  Her classmates designed a sweatshirt celebrating the teacher and wore the sweatshirts to their graduation.  School administration never addressed this hostile environment. *See id.*

In addition to the harassment the student faced from her peers and teachers, the school district made it difficult for the student to apply for college.  The school district failed to submit necessary documentation for the student to receive testing accommodations with the college testing board.  The school district also failed to properly record the student's credits for independent study and physical education classes. Finally, the school district refused to assist the student in obtaining required evaluations and approvals for college admission exams.  *See id.* at 908–09.

Once the student turned eighteen, she filed a complaint against the school district, the two teachers who refused to

comply with her 504 Plan, and other school district officials. The student asserted one claim under Title II of the ADA for failure to provide reasonable accommodations, and one claim under Section 504 for failure to provide reasonable accommodations and for creating a hostile learning environment. *See id.* at 909.

The district court determined that, although the student filed her complaint under the ADA and under Section 504, the gravamen of her claims "involved the provision of a [FAPE] and therefore exhaustion was required." *Id.* We reversed, concluding that "the crux of [the student's] complaint seeks relief for the disability-based discrimination and harassment she faced at school, and not for the denial of a FAPE under the IDEA. As a result, [the student] need not exhaust the administrative remedies under the IDEA." *Id.* at 914 (internal quotation marks omitted).

We gave several reasons for reaching the conclusion that exhaustion was not required. The first was that the accommodations requested (quiet location for exams, more time for exams, and compliance with emergency health protocol) "cannot be construed as special education because they do not provide specially designed *instruction*." *Id.* (internal quotation marks omitted) (emphasis in the original). We noted that "a child with . . . ADD may need preferential seating and the use of a word processor, but not special education." *Id.*

We next explained that the student's complaint alleged that the school district "discriminated against her by creating a hostile learning environment." *Id.* at 915. This claim was predicated on the lack of support from school officials and harassment from her peers rather than denial of a FAPE under the IDEA. *See id.* Because the student's claim was predicated only on Section 504 and because the student

"never sought or received special education and related services, a hostile learning environment could not be said to have interfered with any such services. Thus, . . . [the student did] not seek . . . only relief that an IDEA officer can give." *Id.* (citation and internal quotation marks omitted).

We applied the "clues" from *Fry* to "also support the conclusion that [the student's] lawsuit [did] not seek relief for the denial of a FAPE under the IDEA." *Id.* We observed that testing accommodations "may be required for a variety of entities that offer professional licensing and credentialing exams." *Id.* (citations omitted). Accordingly, under "*Fry*'s first hypothetical, a plaintiff could have brought essentially the same claim for testing accommodations at a public facility that was not a school." *Id.* at 915–16 (internal quotation marks omitted). Addressing the second hypothetical, we observed that "if the District used any sort of eligibility exam for its employees, an adult at the school could assert the same right to testing accommodations." *Id.* at 916 (internal quotation marks omitted). Thus, unlike with D.D., the answers to the *Fry* hypotheticals in *McIntyre* weighed in favor of the plaintiff and against an exhaustion requirement. Because D.D. was unquestionably receiving special education and had an IEP, our decision in *McIntyre* does not support the majority's analysis. Instead, as noted, the cases cited by the majority from within our circuit concluded that cases similar to D.D.'s sought relief from the denial of a FAPE and required administrative exhaustion. *See Paul G.*, 933 F.3d at 1098–1100; *see also S.B.*, 327 F. Supp. 3d at 1252–53.

At bottom, and as we emphasized in *Payne*, the outcome of this case is determined by the allegations in the complaint. *See* 653 F.3d at 875 ("[W]hen determining whether the IDEA requires a plaintiff to exhaust, courts should start by

looking at a complaint's prayer for relief and determine whether the relief sought is also available under the IDEA.") If the relief sought is not available under the IDEA, exhaustion is likely not required. On the other hand, if the relief sought is available under the IDEA, exhaustion is likely required. *See id.* We specified that "exhaustion is required in cases where a plaintiff is seeking to enforce rights that arise as a result of a denial of a [FAPE] . . . to provide the basis for the cause of action (for instance, a claim for damages under § 504 of the Rehabilitation Act . . . , premised on a denial of a FAPE." *Id.* We clarified that claims arise under the IDEA if the "IDEA violation is alleged directly" or "if a § 504 claim is premised on a violation of the IDEA." *Id.* A review of the claims for relief in D.D.'s amended complaint fit the description of a § 504 claim "premised on a violation of the IDEA." As discussed, D.D.'s complaint was replete with asserted violations of the IDEA, primarily through failure to provide a "one-to-one behavior aide." Under our analysis in *Payne*, and more recently in *McIntyre* exhaustion was required.

I would affirm the judgment of the district court.